## JOSE MARIA FUENTES *v.* THE UNITED STATES.

A petition was presented to the board of commissioners in California, claiming the confirmation of a title to land, which petition alleged—

1. that a grant had been issued by Micheltorena, and delivered in June, 1843.

2. That it was recorded.

3. That it was not to be found in the archives, because the record had been burned.

4. That the grant was approved by the Departmental Assembly, but that the record of such approval had been burned.

5. That therefore the claimant could not produce any evidence that the grant had been so approved.

The secondary evidence offered does not prove the existence of such records, nor their destruction. The recital in the grant is not sufficient evidence of this.

The paper produced by the claimant, purporting to be a grant, must therefore be judged by itself. There was no evidence that it had been preceded by the usual formalities, such as a petition, an examination, an inquiry into the character of the applicant, an order for a survey, a reference to a magistrate for a report, a transmission of the grant to the Departmental Assembly, nor was there an expediente on file.

Where these requirements do not appear, a presumption arises against the genuineness of the grant, making it a proper subject of inquiry before that fact can be admitted.

The evidence produced in this case does not establish the genuineness of the grant.

There is also an absence of all proof that the grant had been delivered to the grantee, then a minor, or to any one for him. If the grant was genuine, and not delivered until after the cession of California to the United States, it would not give the grantee any right to claim the land.

A recital in the paper or grant, that the pre-requisites had been complied with, is not sufficient ground for a presumption that they had been observed. The cases decided heretofore by this court do not support the position.

These cases examined.

If the conditions imposed by the grant were conditions subsequent, yet the grantee allowed years to pass without any attempt to perform them until a change of circumstances had taken place, which amounts to evidence of an abandonment.

THIS was an appeal from the District Court of the United States for the northern district of California.

The nature of the title, and evidence in support of it, are stated and commented on in the opinion of the court, and need not be repeated.

It was argued by *Mr. Blair* for the appellant, and by *Mr. Black* (Attorney General) for the United States. *Mr. Blair* also filed a brief by *Mr. Crockett*, which he adopted as his own.

*Mr. Blair* contended:

1. That neither the grant itself nor the law fixed any period within which the grantee was required to take possession.
See Jones's Report, p. 22, and Larkin's case.

2. That the minority of the grantee was, perhaps, the reason why the common requirement as to time was not one of the conditions of the grant, and repels any presumption of an intention to abandon the claim arising from the delay in occupying the land.

3. That no law, regulation, or custom, forbade grants to minors, and the court will not undertake to revise the discretion of the Governor as to the proper persons to receive grants.

4. That as the grant purports to have been recorded in the archives, and it is shown that the book corresponding to the year in which this grant was made was destroyed, the case made comes fully up to the requirements of the Cambuston case.

5. That as the genuineness of this grant was not questioned below, it cannot be impeached here, even on the testimony in the record. So the court held in Larkin's case. *A fortiori,* the court will not consider the extraneous matter offered by the Attorney General, whether offered as testimony or as historical facts, which, if true, might have been explained, if they had been offered below.

These points were more particularly stated in the brief which *Mr. Blair* adopted, viz:

1. That the grant is valid, and ought to be confirmed, not-

withstanding there was no approval of the **Departmental As-**sembly, and no judicial measurement.

United States *v.* Fremont, 17 How., **560.**

United States *v.* Reading, 18 How., **8.**

United States *v.* Cruz Cervantes, 18 **How., 558.**

United States *v.* Vaca, 18 How., **556.**

United States *v.* Larkin, 18 How., 563.

2. The grant was duly recorded, and on the face of the grant the original is ordered to be delivered to the grantee, who now produces it.

3. The proof shows that it was written and recorded in 1843, when, it is conceded, Governor Micheltorena had full authority to grant lands.

4. The authenticity, date, and recording of the grant, being clearly established, and the grant itself reciting that the grantee had petitioned for the land, and that all "the necessary steps and the precautionary proofs required by the laws and regulations" had been taken, the law will presume that the Governor had performed his duty in these respects, and had not exceeded his powers.

United States *v.* Peralta, 19 How., 347.

United States *v.* Aredondo, 6 Pet., 729.

United States *v.* Delassus, 9 Pet., 134.

Minter *v.* Crommelin, 18 How., 88.

Bagnell *v.* Broderick, 13 Pet., 448.

5. This grant had only the usual conditions; and they were all subsequent conditions, the non-performance of which would not, *ipso facto*, avoid the grant.

6. The fact that the grantee was a minor did not invalidate the grant. There is nothing in the act of 1824, or the regulations of 1828, restricting the power of the Governor in this respect. Under the Mexican and civil law, the age of majority was twenty-five; and the policy of the colonization laws was not at variance with a grant of lands to a person under that age. For aught that appears, a minor might be as capable as any other of cultivating and improving his lands. If minors be excluded for want of capacity, the same reasoning would exclude old, infirm, and indigent persons, or females

of feeble capacity, and especially married women. The capacity of the grantee, and his fitness to take the grant, and the propriety of making it, under all the circumstances, were precisely the questions submitted to the discretion of the Governor, and these questions cannot be litigated over again.

7. If it be conceded that the conditions were not fulfilled, this fact can raise no presumption of abandonment in this case. In the case of Fremont, this court decided, that whilst the conditions are subsequent, and a failure to perform them, in the absence of a "denouncement" of the land by another, will not divest the title, yet that an unreasonable delay in performing the conditions may amount to evidence of abandonment; and that the party is now seeking to resume his ownership, after the lands have become enhanced in value. In the Fremont case, a failure to perform the conditions was excused, because of the unsettled state of the country, and the dangers arising from hostile Indians in that vicinity. In the case at bar, the country was not only in a revolutionary state from the date of the grant, until about the period when the American forces took possession of the country, but the grantee was a minor, and so continued, until the last-named period. We maintain, that no presumption of abandonment will arise against a minor, under either the civil or common law.

Under the Spanish law in force in Mexico, the rights of minors are more fully protected than even at common law, as will appear by reference to 1 Domat's Civil Law, page 529, book IV, title 6, section 2, where the law relating to minors is fully collated.

Under the civil law, the term "abandonment" has a technical and definite meaning, to wit: "that if a man be dissatisfied with his unmovable estate, and abandon it immediately, and depart from it corporeally, with an intention that it shall no longer be his, it will become the property of him who first enters thereon.

1 Partidas, Law 50, p. 365.

Escriche, p. 5, title "Abandono de cosas."

Landes *v.* Perkins, 12 Missouri R., 238.

In certain cases, the doctrine of abandonment is rigidly en-

forced under the Spanish law; but these are special cases, and this is not one of them.

See Escriche, page 6.

The author says: "But these strict principles are not admitted in our general laws, and we have already seen that every proprietor may preserve his estate in lands, although he has failed to cultivate them for many years." But an intention to abandon his estate will not be presumed against a minor, nor will prescription run against him.

Escriche, p. 1230, title "Menor."

Calvin *v.* Innis, 10 Martin (La.) R., 287.

9 Louisiana R., 379.

Orso *v.* Orso, 11 Louisiana R., 62.

It is evident therefore that under the Spanish law of abandonment the grantee in this case did not lose his land. But, in such cases, how is the fact of abandonment to be ascertained? The only effect of it is, not to forfeit the land to the sovereign, but to enable the first occupant to claim it as his. Before his right is established, it must be done by some judicial proceeding; and no other is known to the Spanish law than the process of "denouncement," which is employed not only in obtaining a title to abandoned lands, but also to mines which have been abandoned. It is a judicial proceeding, conducted with much formality, and after due notice.

1 Rockwell's Spanish and Mexican Law, 50 to 56.

9. The title of the grantee is a legal and not an equitable title. His grant is a patent, and conveys the legal estate, which would maintain ejectment.

Ferris *v.* Coover, 10 Cal. R., 589.

In several cases before this court, from California, grants similar to this have been deemed and held to be equivalent to patents. The claimant's application for a confirmation is not, therefore, addressed to the equity side of the court; but he invokes its judgment upon the question whether or not he has a valid legal title to the land; and if so, he asks that it be confirmed. In such a case, the only question presented is, whether or not he produces a valid and definitive grant, free from fraud. If his grant be of that character, it is not per-

ceived how the question of abandonment can arise. No mode is known to our laws, by which a legal title can be "abandoned," so as to work a forfeiture; and we have already shown, that under the Spanish law, in order to divest the title, the fact of abandonment must be ascertained. No such proceeding having occurred in this case, the title is unimpeached.

The Attorney General referred particularly to the dates of the grant and other papers connected with the title, and then made the following points:

This grant is illegal and contrary to the laws and customs of the Government of Mexico, because—

I. The grantee was a minor at the time of its date, and incapable for that reason of performing the conditions annexed to it.

II. It is void because it was made by a Governor who was a near relative of the grantee.

III. There was no petition; no examination into the condition of the land or the character of the applicant; no map of the land; no reference to any magistrate or officer; no report upon the case; and, therefore, the Governor had no authority, jurisdiction, or power, to make the concession, even if the grantee had been a stranger to his blood.

IV. There is no expediente on file, and no note or record in any book among the archives of the Department.

V. Besides all this, it is fraudulent and spurious, a base and impudent forgery. For this assertion I give the following reasons:

1. The fact that no trace of this grant is to be found upon the record, is of itself conclusive evidence against its genuineness.

2. The grantee never took possession of the land, nor claimed title under it, nor produced the grant, until 1852.

3. The subscribing witness to the execution of the grant (Jimeno) was not called, and we must presume that he was not called because it was known that he would pronounce the paper to be fraudulent.

4. The testimony substituted in place of the best evidence

was that of witnesses who, at the very most, could prove nothing beyond their own belief. One of them does not prove even so much, but only that the signatures are like those of Micheltorena and Jimeno.

5. But these witnesses, no matter what they swear to, are unworthy of belief. They are professional witnesses. (See table in Limantour documents.) No court in California, where Manuel Castro's achievements as a witness are known, would pronounce a judgment upon his testimony. Abrego was incontestably proved to be guilty of perjury in the Limantour case, and the fact was so announced by the court.

6. The grant is dated at Monterey, on the 12th of June, 1843. Manuel Castro says it was written and executed there. But the fact is, that Micheltorena was not at Monterey until the 28th of September, 1843, that being the date of the earliest public paper on record which appears to have been issued from that place. On the 12th of June, 1843, he was at Los Angeles, as his public correspondence shows.

Exhibit H, Limantour case.

7. But the forgery of this paper can be conclusively established by ocular demonstration. On page 73 of the photograph exhibits contained in the library of the court will be found an exact photographic copy of this grant. On page 75 are the signatures. The signature of Manuel Jimeno there, when it comes to be compared with the genuine signatures elsewhere in the same book, will speak for itself.

It is not at all difficult to see how and when this grant was fabricated. It is in the handwriting of Manuel Castro, a part of whose business consisted in forging land grants. Probably enough, Micheltorena's name may have been put to it by his own hand, or it may have been written on one of those blank grants which Micheltorena issued after the treaty of peace. Either way, it is very certain it was done at the city of Mexico, as late as the year 1850. Manuel Castro wrote it then and there, and not at Monterey in 1843. The court will observe that, though the grant is dated in 1843, and the power of attorney on the back of it bears date at the city of Mexico, in 1848, there is no official attestation of either, nor anything

else which can repel the presumption of forgery, earlier than 1852. It is very certain that at that time the paper was in existence, with the power of attorney on its back. But it had been fabricated a very short time before. There are several other grants in Manuel Castro's handwriting. (See pages 54, 56, 64, and 67, of the photograph exhibits.) They were made about the same time, and they are known to be forgeries, for they have Limantour's false seal, which was certainly not made before 1850.

Mr. Justice WAYNE delivered the opinion of the court.

The appellant has come to this court asking for a confirmation of his claim to eleven leagues of land, called Potrero. The paper under which he claims the land purports to be a grant from Governor Micheltorena. It recites that the land is within the ex-mission of San Jose, bounded on the north by the locality called the Warm Springs, on the south by Palos, on the west by the peak of the hill of the ranchos Tulgencio Higuera and Chrysostom Galenda, and on the east by the adjoining mountains. It also recites that the Governor had taken all the necessary steps and precautionary proofs which were required by the Mexican laws and regulations for granting lands, and that he had granted the land upon the following conditions to the appellant:

1. That he should enclose it without prejudice to the cross-ways, roads, and uses; that he shall have the exclusive enjoyment of it, and apply it to such use and culture as may best suit his views.

2. That he should apply to the proper judge for judicial possession of the same, by whom the boundaries shall be marked out, and along which landmarks should be placed to designate its limits, and that fruit and forest trees shall be planted on the land.

3. That the land given should contain eleven leagues for large cattle, as is designated by a map said to be attached to the expediente. The land is to be surveyed according to the ordinance; and should there be an overplus, it was to inure to the benefit of the nation.

*Fuentes v. United States.*

The title is to be recorded in the proper book, and then to be delivered to the petitioner for the land, for his security. This paper bears date the 12th June, 1843, and has the name of Micheltorena to it, which is denied to be his signature.

The first inquiry, then, concerning it, should be into its genuineness. Was it executed by Governor Micheltorena? Has the party claiming proved it?

The testimony introduced in support of the genuineness of the paper is to be found in the depositions of Zamon De Zaldo, Jose Abrego, Manuel Castro, and Joseph L. Folsom. Zaldo declares himself to be chief clerk and interpreter to arrange and classify the Spanish and Mexican archives in the custody of the surveyor general of California. He was not interrogated as to the signature to the paper, and says nothing about its having been executed by Micheltorena. He was asked what he knew of the book of land titles of the Mexican Government for the year 1843. He answers that he knew that a book for the year 1843 was not in the office, though he did not know of his own personal knowledge that such a book ever existed, and that all that he did know about it had been learned from a correspondence in the office, that such a book belonging to the archives had been in the possession of J. L. Folsom, United States quartermaster at the time, and that he had learned, in the same way, that it was destroyed with Folsom's papers by the fire in San Francisco of 1851. Folsom states that a book of records, containing grants of land in Upper California, had been put into his possession in the spring of 1851, to be used as evidence in the suit of Leese & Vallejo v. Clark, then pending in the Superior Court of the city of San Francisco. It was in the Spanish language, and came from the archives of the Mexican Government of California, then in the possession of the commanding general at Benicia, and was delivered to him as an officer of the army, for safe keeping. He adds: after the book was used as evidence, it was returned to me, and was deposited in my office in the city of San Francisco; and whilst there, the great fire of the 3d and 4th May, 1851, occurred, by which my office and its contents, including the said book, were destroyed. And he then con-

cludes his deposition, saying: "*I am not positive as to the date of the grants contained in the said book, but from my best recollection, my impression is that they were for the years* 1843 *and* 1844." The purpose for which Zaldo and Folsom were made witnesses for the claimant was to connect the book which Zaldo said was not among the archives with the book which Folsom said had been burned, that it might be inferred, from the date of the paper upon which Fuentes rests his claim, that it had been recorded in that book. It is stated in the petition that the grant was issued and delivered in due form of law on the 12th June, 1843; that it was recorded at the time it was issued; that it was not to be found in the archives; and that he believes that the copy of the grant was burned, and on that account could not be produced. It is further stated, that the grant had been approved by the Territorial Legislature, and was in all respects formally completed according to law, but that the records of the Legislature for the year 1843 were in like manner destroyed by fire at the same time with the record of the grant, and that the claimant could not produce any evidence of the approval of the grant by the Legislature. In this recital from the petition we find a very exact anticipation of what the evidence ought to be, to prove that such a grant had been issued, and that it had been duly recorded, but none such was introduced. Zaldo believes, from a correspondence in the office, that a book belonging to it had been burned while it had been in the safe keeping of Folsom. Folsom says a book from the archives was burned, but that he cannot be positive as to the date of the grant in it, but that from his best recollection his impression was, the grants in it were for the years 1843 and 1844; and Zaldo declares that he had no personal knowledge that such a book ever existed, but adds, that there is wanting in the office a book for the year 1843. This falls far snort of the evidence which was necessary to connect the alleged grant with the archives of the office. There is no other evidence in the record to supply such deficiency. And it is admitted now that the paper was never sent to the Departmental Assembly.

. In truth, between that burned book and the Fuentes paper,

the testimony in the record makes no connection whatever. The mere declaration that it was dated in 1843 cannot do so. Nor can any implication of the kind be raised from the testimony of Abrego and Castro. Neither of these witnesses were interrogated concerning the burned book, nor was any attempt made to prove that any of the records of the Departmental Assembly, *especially its approval of this grant,* had been burned at the same time. What has been said of the insufficiency of the evidence to prove the record of the paper applies with equal force to the certificate which is alleged to have been given by Jimeno, that the paper set out in the petition as a grant had been recorded in the proper book, which is used in the archives of the secretary's office.

The case, then, stands altogether disconnected from the archives, and exclusively upon the paper in the possession of Fuentes. It has no connection with the preliminary steps required by the act of Mexico of the 18th August, 1824, or with the regulations of November 28, 1828. It is deficient in every particular—unlike every other case which has been brought to this court from California. There was no petition for the land; no examination into its condition, whether grantable or otherwise; none into the character and national status of the applicant to receive a grant of land; no order for a survey of it; no reference of any petition for it to any magistrate or other officer, for a report upon the case; no transmission of the grant—supposing it to be such—to the Departmental Assembly or Territorial Legislature, for its acquiescence; nor was an expediente on file in relation to it, according to the usage in such cases.

All of the foregoing were customary requirements for granting lands. Where they had not been complied with, the title was not deemed to be complete for registration in the archives, nor in a condition to be sent to the Departmental Assembly, for its action upon the grant. The Governor could not dispense with them with official propriety; nor shall it be presumed that he has done so, because there may be, in a paper said to be a grant, a declaration that they had been observed,

particularly in a case where the archives do not show any record of such a grant.

The act 1824 and the regulations of 1828 are limitations upon the power of the Governor to make grants of land. They are, and were also considered to be, directions to petitioners for land, before they could get titles. Where the petition and the other requirements following it have not been registered in the proper office with the grant itself, a presumption arises against its genuineness, making it a proper subject of inquiry before that fact can be admitted. It is not to be taken as a matter of course; nor should slight testimony be allowed to remove the presumption. Both the kind and quantum of evidence must be regarded. We proceed to state what they are in the record.

None can be found to establish with a reasonable probability the genuineness of the paper upon which the claimant relies. The only testimony bearing upon the genuineness of the paper is that of Abrego and Castro. Both speak of the signature of Micheltorena, and no further. Abrego says that he knew the Governor; that he had frequently seen him write, and that he had examined the signature to the document presented to him. and that he knows it to be the signature of Governor Micheltorena.

Castro is more particular, but not so positive; and he gives a narrative of the origin of the paper, which is certainly peculiar, and from which a reasonable suspicion may be indulged against his disinterestedness. He says: "An instrument in writing is now shown to me, purporting to be a grant to Jose Maria Fuentes, dated June 12, 1843, and it is attached to the deposition of Jose Abrego, heretofore taken in this case, and marked H. J. T., No. 1. I know the paper; it is in my handwriting. I was at the time secretary in the prefect's office in Monterey, and being on terms of friendship with Secretary Jimeno and Mr. Arce, a clerk in his office, I frequently assisted them in their official duties, at their request, and in that manner I wrote the body of this grant. It was written in June, 1843, at the time of its date. I know the signature of Micheltorena; and the signature purporting to be his *appears*

*like his; and the signature of Jimeno on said paper also appears like his.*" The words of the witness have been given.

The signature of Jimeno, of which Castro speaks, purports to be a certificate from Jimeno that the grant had been recorded, the day after its date, in the proper book of the archives of the secretary's department. It is upon the same paper with the title, and purports to have been put upon it by the order of the Governor, "that the title might be delivered to the party interested, for his security and ulterior ends."

Abrego, in a second deposition, says he knew Fuentes and his family, and that he was not of age, but was a minor, on the 7th July, 1846—more than three years after the date of the grant.

Such is all the testimony in this record to prove the genuineness of the signature of Micheltorena, unless it be the notarial certificate, given under the seal of the National College in the city of Mexico; which, as it is presented in this case, is not evidence, and of no account at all.

We will now show that the testimony of Abrego to the signature of Micheltorena is insufficient to establish that fact, and that Castro's deposition gives to it no aid. In truth, the whole case has no other evidence in support of the genuineness of the signature of the Governor than what Abrego has said. In showing this, we shall have no occasion to impeach his character as a man, or his truthfulness as a witness, as there is nothing in this record, whatever there may be in others, to justify such an attack. The case must be decided upon what its own record contains, and upon nothing else.

Abrego's deposition has not that foundation which the rules of evidence require a witness to have, to enable him to prove the genuineness of an official signature to a public document, or a signature to a private writing. The document in this instance purports to be genuine; but whether so or not, it discloses the fact that there is upon it an official witness of its execution and record, who should have been called to prove it, if he was living, and if absent beyond the jurisdiction of the court, whose signature should have been proved by a witness who was familiar with his signature and handwriting, before

secondary evidence could be received of his own signature, or that of the official who is said to have executed the paper.

It was the duty of Jimeno to record all grants which were made by the Governor, and to give attestations of that fact, and which it is said Jimeno did give to the paper in this instance. Why was not Jimeno called? It seems that he was overlooked or not thought of.

The simplest and best proof of handwriting is the testimony of one who saw the signature actually written; and inferior evidence as to his handwriting is not competent, until it has been shown that his testimony to the execution of the paper could not have been procured. And when a document, either public or private, is without a witness, the best evidence to disprove the signature, and to prove it forged, is the testimony of the supposed writer, if he be not incompetent from interest, and can be produced. In the latter case, the next best evidence is the information of persons who have seen him write, or been in correspondence with him.

Such, however, is not this case, though it was acted upon in the court below as if it was so.

Abrego here, then, is in the attitude of an incompetent witness, who was called and permitted to testify before the party by whom he was introduced, had laid a foundation for the next best evidence, when the paper submitted to him showed the fact that the better could have been had, either primarily or secondarily, in the manner we have already indicated. Abrego swears that he knew Micheltorena; that he had frequently seen him write; that he had examined the signature to the document presented to him, and that he knew it to be the signature of Governor Micheltorena. But had Secretary Jimeno been called as a witness, as it was his official duty to test the signature of the Governor to grants, his would have been the best testimony to prove its genuineness in this instance, and that the grant had been transferred to him officially, for delivery to the grantee.

Castro's deposition is in the same predicament with that of Abrego. but with an aggravation of its insufficiency to prove the signature of Micheltorena, and of his incompetency as a

witness. He was not asked if he knew Micheltorena, or was familiar with his handwriting or with his signature, or if he had ever seen him write. He only says: I know the signature of Micheltorena, and the signature to the paper appears like his, and the signature of Jimeno appears like his. He does not say how he had become qualified, by comparison or otherwise, to swear to the signature of Micheltorena; and notwithstanding his declared friendship with Jimeno— so much so, that he was frequently asked to assist him in the duties of his office, and particularly asked to write out in his own hand the paper in question—he has left it to be inferred that he only knew enough of Jimeno's handwriting to enable him to say that the signature to the grant which he wrote out in his own hand appears like Jimeno's signature.

If such was the way of doing business in the secretary's office, which we have no cause for believing, it must have been an easy matter to get from it such a paper as that now in question, and not at all difficult to have been accomplished by one who had such familiar access to the office as Castro represents himself to have had, especially if all of the prerequisites of a grant enjoined by the act of 1824 and the regulations of 1828 were allowed to be disregarded.

This narrative of De Castro, instead of bringing the mind to any conclusion in favor of the genuineness of the signatures of Micheltorena and Jimeno, rather suggests caution in receiving it, and that it ought to be corroborated by other witnesses before that shall be done. It seems to us, too, somewhat remarkable that this witness, familiar as he was with the origin and object of this paper prepared by himself, should not have been questioned concerning its delivery to Fuentes, then a minor, to whom it was delivered for him, or what was done with it at the time of its date, or in whose possession it was from that time until it was presented to the land commissioners for confirmation, in 1852.

There is entire absence of all proof of its having been delivered to Fuentes himself, or to any one for him; but it seems to have found its way to the city of Mexico, as the record snows, and reappears in California years after its cession to

the United States, and more than eight years after it is said to have been executed. The assertion in the paper itself, that the Governor had directed it to be delivered, can be no proof of that fact, until its genuineness shall have been ascertained. If the minority, too, of Fuentes is considered, in connection with the conditions upon which this grant is said to have been made, it may well be inferred that it was not delivered to the grantee, as he was not then in a situation to carry out the conditions of the grant, without the intervention of a tutor or guardian, and nothing was done to perform those conditions at any time afterward.

We do not speak now of such non-performance as a cause sufficient for denying a right claimed under a genuine grant; but only as a fact in this case accounting for the non-performance of the conditions of the grant, and making it probable that Fuentes did not receive this paper until some time after its date from Micheltorena, and not until after the cession of California to the United States. A delivery after the latter event, by a former Governor of California, would not give a grantee a right to claim the land by any obligation imposed upon the United States by the treaty of Guadalupe Hidalgo.

We have given to this case a very careful examination, and have concluded that no evidence can be found on its record to sustain the genuineness of the paper under which the land is claimed. That there is none to prove its registry in the archives of the Secretary's office, at the time of its date or afterwards. That no reliable proof has been given to connect it with the book of records, which had been committed to the care of the witness, Folsom, and was burned in his office. That it does not appear that any one of the precautionary requirements, before a grant of land could be made by a Governor of California, had been complied with in this case. That there is no proof whatever that such a paper as that in question had been delivered to the claimant at any time before the power of Mexico in California had ceased; and it was admitted, in the argument of the case here, that no such paper had been sent to the Departmental Assembly for its acquiescence, as a grant from the Governor.

It was, however, urged in the argument, that such prerequisites for a grant of land should be assumed to have been observed, on account of a recital in the paper or grant that they had been. Several cases from the reports of this court were cited, being supposed by counsel to support the position. None of them do so. We have not been able to find a case reported from this court, either under the Louisiana or Florida cession, that does. Peralta's case, in 19 Howard, 343, does not do so. The decision there is, that when a claimant of land in California produced documentary evidence in his favor, *copied from the archives in the office of the Surveyor General,* and other original grants by Spanish officers, the presumption is in favor of the power of those officers to make the grants. There, the authenticity of the documents was admitted, and the validity of the petitioner's title was not denied, on the ground of any want of authority of the officers who made the grant. This court then said, that the public acts of public officers, importing to be exercised in an official capacity and by public authority, shall not be presumed to be usurped, but that a legitimate authority had been previously given or subsequently ratified.

In the case of Minturn et al. *v.* Crommelin, 18 Howard, 88, it was ruled that when a patent for land has been issued by the officers of the United States, the presumption is in favor of its validity, and passes the legal title, but that it might be rebutted by proof that the officers had no authority to issue it, on account of the land not being subject to entry and grant. In Delassus's case, 9 Peters, 117, 133, the inquiry was, whether the concession was legally made by the proper authority; but the concession, being in regular form, carried *prima facie* evidence that it was within the power of the officer to make it, and that no excess or departure from instructions should be presumed, and that he who alleges that an officer intrusted with an important duty has violated it, must show it. But there was no question in that case about the genuineness of the concession. That was admitted. The genuineness of the grant in Arredondo's case, 9 Peters, was not questioned. Nor was the genuineness of the patent in Bagnel's case, 13 Peters,

437, a subject of controversy. This court ruled in that case, that a patent for land from the United States was conclusive in an action at law, and that those who claim against it must do so on the equity side of the court. It is not, however, to be supposed that no title in California can be valid, which has not all of the preliminary requirements of the act of the Mexican Congress of 1824, and of the regulations of 1828. But if none of them are to be found in the archives, and it cannot be established by the proof that they were registered there, this court will not presume that they were preliminary to a grant, because the Governor recites in the grant that they had been observed. In what we have said upon this point, we are reaffirming this court's opinion in Cambuston's case, 20 Howard, 59. And we now take this occasion to repeat, that when it shall appear that none of the preliminary steps for granting land in California have been taken, this court will not confirm such a claim. For the reasons already given, we shall affirm the decree of the District Court in this case.

But we also concur with that court in its rejection of this claim, supposing it to be genuine, upon the ground that there was no proof of a survey or measurement of this land, or any performance of its conditions, from which it may be inferred that the grantee had abandoned his claim. It is said that these were conditions subsequent, the non-performance of which do not necessarily avoid the grant. This is the case as to some of them; but even as to such, when a grantee allows years to pass after the date of his grant without any attempt to perform them, and without any explanation for not having done so, and then for the first time claims the land, after it had passed by treaty from the national jurisdiction which granted it, to the United States, such a delay is unreasonable, and amounts to evidence that the claim to the land has been abandoned, and that a party under such circumstances, seeking to resume his ownership, is actuated by some consideration or expectation of advantage, unconnected with the conditions of the grant, which he had not in view when he petitioned for the land, and when it was granted. The language just used was suggested in the Fremont case. The

occasion has arisen in this case, when it becomes necessary to affirm it as a rule, to guide us in all other cases hereafter which may be circumstanced as this is.

**The decree** of the District Court in this case is **affirmed.**