# UNITED STATES *v.* ELDER.

### APPEAL FROM THE COURT OF PRIVATE LAND CLAIMS.

No. 35. Argued October 13, 16, 1899.—Decided March 26, 1900.

*United States* v. *Ortiz,* 176 U. S. 422, affirmed and followed, to the point that, in order to justify the confirmation of a claim under an alleged Mexican grant, under the act of March 3, 1891, c. 539, 26 Stat. 854, it is essential that the claimants establish, by a preponderance of proof, the validity of their asserted title.

The mere approval, by the governor, endorsed on a petition presented to him for a grant, before a reference to ascertain the existence of the prerequisites to a grant, is not the equivalent of a grant.

In order to vest an applicant under the regulations of 1828, with title in fee to public land, it was necessary that the grant should be evidenced by an act of the governor, clearly and unequivocally conveying the land intended to be granted, and a public record in some form was required to be made of the grant; and the action of the legislative body could not lawfully be invoked for approval of a grant, unless the expediente evidenced action by the governor, unambiguous in terms as well as regular in character.

The mere indorsement by a Mexican governor of action on the petition, before any of the prerequisite steps mentioned in the regulations of 1828 had been taken to determine whether, as to the land and the applicants, the power to grant might be exercised, was a mere reference by the governor to ascertain the preliminary facts required to justify an approval of an application, and had no force and effect as an actual grant of title to the land petitioned for.

Although the documents in question in this case, executed by the prefect and the justice of the peace, fairly import that those officials assumed authority to grant something as respected the land in question, they did not, in 1845, possess power to grant a title to public lands.

THE alleged Mexican grant which forms the subject of this controversy relates to a tract of land situate in the county of

Taos, New Mexico, embraced in what is designated as the Cebolla grant. The asserted grant was presented in 1872 for confirmation to the surveyor general of New Mexico, under the act of July 2, 1854, by John T. Graham and William Blackmore, who averred that they possessed a perfect title to the land covered by the grant, by reason of mesne conveyances from the original grantees. This claim so presented was favorably reported to Congress, but it does not appear that any action was taken thereon. Upon a survey made by the direction of the General Land Office in November, 1877, the area embraced in the alleged grant was declared to consist of 17,159.57 acres. The controversy now here for review was commenced by proceedings instituted in the Court of Private Land Claims to obtain a confirmation of this alleged grant. The petition to that end was filed on February 18, 1893, on behalf of the present appellees, who asserted that they were the owners of the Cebolla tract by purchase from the heirs and assigns of the original grantees. The alleged grant was asserted to have been made on December 31, 1845, by Manuel Armvjo, governor of New Mexico, and the papers claimed to evidence such grant, as translated, are reproduced in the margin.[1]

---

[1] Seal Fourth. [SEAL] Two reales.
Years one thousand eight hundred and forty-two and one thousand eight hundred and forty-three.
Habilitated for the years one thousand eight hundred and forty-four and one thousand eight hundred and forty-five.
Administrator AGUSTIN DURAN. Governor MANUEL ARMIJO.
To his excellency Manuel Armijo, Governor of this Department of New Mexico:
I, Carlos Santistevan, for myself and in the name of five other associates, all residents of the town of Dolores, in the district of Taos, before your excellency in due legal form, represent and state that finding without any land with title in fee to cultivate for the support of ourselves and our needy families, and having found a vacant tract very suitable tract for cultivation, irrigable from certain water, said to be from the Lama, quite sufficient for its irrigation, at the place called by that name up to another place, the Cebolla, which places are between the settlements of the Rio Colorado and San Cristoval, pertaining to the said district of Dolores de Taos, I ask and pray, from the well known and distinguished liberality of your excellency, that in the name of the high powers of our Mexican Republic, you be pleased to

It was averred in the petition with respect to the survey above referred to, that it was not made in accordance with the boun-

---

make us a grant of the said tract; for the same is of very convenient size, and has ample water to be cultivated, and to afford sufficient support for the petitioners and their families, and would not injure any third party with respect to property or pasturage, or in any other way, but would rather result in the great welfare and increase of population and of agriculture; and, besides relieving the necessity of the petitioners, it will also strengthen that locality or frontier which guards the said population of the Rio Colorado, from which the said tract is distant but about one league, and from the settlement of San Cristoval somewhat more.

Therefore I earnestly pray that your excellency be pleased to accede to this our petition. I declare and protest, etc.

City of Santa Fé, December 31, 1845.   At the disposition of your excellency.

CARLOS SANTISTEVAN.

SANTA FÉ, *December* 31, 1845.

To the prefect of the district, that he ascertain whether the land applied for has an owner, and cause the corresponding justice to deliver the land referred to by the petitioner.                                                  ARMIJO.

JUAN BAUTISTA VIGIL Y ALARID, *Secretary.*

RIO ARRIBA, *January* 3, 1846.

The justice of the peace to whom it corresponds to do so will investigate whether the tract the petitioners apply for is vacant, and whether any injury to a third party would result from the granting thereof; and, none resulting, he will proceed to grant them of the land an abundance of what each can cultivate, under the condition that they inclose the same with a regular fence, in order to prevent damages, and that they do not obstruct the roads, pastures and watering places, and with notice that they shall keep arms sufficient for their defense.

D. LUCERO.

In this, the third precinct, Dolores, of the district of Taos, on the twentieth day of the month of March, one thousand eight hundred and forty-six, I, Juan Lorenzo Martines, justice of the peace, by authority of law, for the said precinct, in pursuance of a decree of January 3, eighteen hundred and forty-six, by his honor Diego Lucero, prefect of the second district of the north, issued to me as the proper justice, that I investigate whether the land applied for by the five petitioners is vacant, and I, meeting no impediment, proceeded to the tract and, finding the same uncultivated and unoccupied, took the petitioners by the hand, and leading them very slowly and in full legal form, in virtue of holding competent authority, I placed them in possession of the land they pray for for cultivation, they being without land in fee, doing so in the name of God and of the

daries set forth in the grant, but was " of a different portion of land, a part or all of which is included in the said grant." The

---

high authority of our wise Mexican laws, which are sufficient to grant the public domain, to the end that idleness be banished and agriculture be encouraged. Wherefore they, at the instant they received their liberal donation and were favored in this manner, shouted with joy, saying huzza for the renowned sovereignty of the Mexican nation. And in this joy they plucked up grass and cast stones, as being lawful proprietors of the land which they wished to irrigate with the water of the valley of the Lama, as relying upon that small water source they had applied for the donation ; and I therefore designate to them for limits: On the north, the boundaries of the Rio Colorado grant; on the south, to where the dividing line of San Cristoval is reached; on the east, the mountain, and on the west, the edge of the bluff of the Rio Del Norte, leaving the pastures, roads, and watering places free, eastwardly, from where they cannot irrigate; they not to prevent pasturing in virtue of being the possessors; and they are also obligated to inclose with a regular fence, so that they may not have to claim damages, and shall keep arms sufficient for their protection.

And to the end that this grant may in all time subsist, I authenticate the same under the authority conferred upon me, with my attending witnesses, for the lack of a notary public, there being none in this department ; and it is done on this common paper, there being none of the proper stamp, the new settlers binding themselves to supply the same of the proper stamp whenever they can opportunely procure it; to all of which I certify.

J. LORENZO MARTINES.

Attending: JUAN JOSÉ CORDOVA.
Attending: JOSÉ CONCEPCION MEDINA.

NOTE.—The persons placed in possession, with their full names, are those following in this list of names, made that they, for the sake of peace and good neighborhood, may in proportion to the tract divide among themselves the land I delivered them without measuring, owing to the very inclement day and the much thicket which impeded the cord ; and they are in this list : Juan Carlos Santistevan, José Manuel Garcia, Julian Santistevan, Carlos Ortivis, Tomas Ortivis.

Valid. [RUBRIC.]
Attending: JUAN JOSÉ CORDOVA.
Attending: JOSÉ CONCEPCION MEDINA.

Tomas Ortivis being of those placed in possession in this grant, at the foot of which this note is appended, he transfers to his brother Carlos Ortivis, all his rights in this grant; and he signed this before me, Lorenzo Martin, alcalde, and the said Tomas signed this with me this 7th April, 1850.                                              LOR'O MARTIN, *Alcalde.*

Attending: RAFAEL SISNEROS.          TOMAS ORTIVIS.     X
Attending: MATEO ROMEO.     X

Court of Private Land Claims entered a decree, (Murray, J., dissenting,) defining the boundaries of the tract covered by the claim as allowed, and confirming title thereto in " the heirs and assigns of said five original grantees and to their heirs and as-signs." The United States thereupon appealed to this court.

*Mr. Matthew G. Reynolds* for the United States. *Mr. Solic-itor General* and *Mr. William H. Pope* were on his brief.

*Mr. T. B. Catron* for Elder.

MR. JUSTICE WHITE, after making the foregoing statement, delivered the opinion of the court.

It is contended that the court below erred in confirming the alleged grant—

1. Because the documents relied upon, assuming them to be genuine, do not show that a grant was made, for the reason that on their face they do not purport to be a grant by the governor of New Mexico ;

2. Even if the papers can, on their face, be construed as im-porting a grant by the governor, the claimants were not enti-tled to confirmation, because there was no archive evidence of the alleged grant and no inscription of the same in the records of the former government ;

3. That the governor of New Mexico was without authority to make a grant of public lands at the time the papers relied upon purport to have been executed ; and—

4. That even if it be conceded that the governor, at the time in question, had power to make a grant, and that the papers are held to be a manifestation of his purpose to do so, yet, be-

---

Carlos Ortivis being of those placed in possession under this grant, at the foot of which this note is appended, he transfers to the citizen José Gonzales his rights in the grant; and he signed this before two witnesses present; and he transferred his rights for the price of two dry cows, one cow with a calf and one yoke of oxen; which he signed with the witnesses this 29th of September, 1850.      CARLOS ORTIVIS.   X

Witness: JOSÉ MIGUEL PACHECO.
Witness: JOSÉ BITOR VALES.   X

cause of a failure to show compliance with essential conditions exacted by the Mexican law, the claimants have not established such a case as entitles them to a decree of confirmation.

The matters embraced in the two last propositions involve legal questions of serious moment, which have been elaborately discussed at bar, but are unnecessary to be considered, if at all, until the subjects covered by the first two contentions are disposed of.

Before approaching a consideration of the two first questions, which logically come under one head, we premise by stating that in order to justify the confirmation of a claim, under the act of March 3, 1891, c. 539, 26 Stat. 854, it is essential that the claimants establish, by a preponderance of the proof, the validity of their asserted title. *United States* v. *Ortiz,* 176 U. S. 422.

To ascertain whether the papers relied upon constitute a grant of title to land, and to determine whether the existence of archive evidence of a grant is an essential prerequisite to the confirmation of the alleged title, it is necessary to briefly recapitulate the provisions of the Mexican colonization law of 1824 and the regulations of 1828 thereunder, and to review previous adjudications on the subject of the form required by Mexican law to manifest that the power to grant had been exercised. It is necessary to do this, since it is undoubted that although it be conceded that the governor of the Territory of New Mexico possessed power in 1845 and 1846 to make a grant of public lands situated within that territory, nevertheless the right to exercise such power as well as the documents by which it was essential to manifest the calling into play of the power, was derived from and was dependent upon the colonization law and the regulations thereunder just mentioned.

The law of 1824 was enacted to provide for the colonization of vacant public lands, and the regulations were adopted for the purpose of executing the powers which the law conferred. Certain articles or sections of the regulations of 1828, to which we shall hereafter have occasion to refer, are printed in the margin.[1]

---

[1] Excerpts from the Regulations of November 21, 1828 (Reynolds' Span. & Mex. Land Laws, pp. 141, *et seq.*):

In brief, the regulations of 1828, adopted to carry into effect the law of 1824, required every applicant for a grant of land to present a petition to the executive head of the territory, alleg-

"1. The political chiefs of the territories are authorized, under the law of the General Congress of the 18th of August, 1824, and under the conditions that will hereafter be stated, to grant the public lands of their respective territories to the contractors, families or private persons, Mexicans or foreigners, who may apply for them for the purpose of cultivating them or living upon them.

"2. Every applicant for land, whether contractor, head of family or private person, shall apply to the political chief of the respective territory with an application in which is given his name, country, profession, the number, nature, religion and other circumstances of the families or persons whom he desires to colonize, and shall also mark as distinctly as possible and describe on a map the land he applies for.

"3. The political chief shall proceed immediately to obtain the necessary information as to whether or not the conditions required by said law of the 18th of August are found in the application, both as regards the land and the applicant, either that this latter be attended to simply or that he be preferred, and shall at the same time hear the respective municipal authority as to whether any objection or not is found to the grant.

"4. In view of all of which the political chief shall grant or not said application in strict conformity with the law applicable to the matter, especially with that of the 18th of August, 1824, already cited.

"5. The grants made to private persons or families shall not be held to be definitely valid without the previous consent of the territorial deputation, for which purpose the respective proceedings shall be forwarded to it.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"8. The grant asked for being definitely made, a document signed by the political chief shall be issued to serve as a title to the party in interest, it being stated therein that the grant is made in entire conformity with the provisions of the laws, in virtue of which the possession shall be given.

"9. The corresponding entries of all the applications presented and grants made shall be made in a book intended for the purpose, with the maps of the lands that shall be granted, and a detailed report shall be forwarded to the supreme government every quarter.

"10. No stipulation shall be admitted for a new settlement, unless the contractor obligates himself to furnish at least twelve families as settlers.

"11. The political chief shall set a reasonable time for the settler, within which he must necessarily cultivate or occupy the land in the terms and with the number of families which he has stipulated, in the intelligence that if he does not do so the grant of the land should be void, but the political chief may, nevertheless, revalidate it in proportion to the part in which the party in interest had complied.

ing the existence of certain facts.   That official was directed to
obtain information as to whether or not the necessary conditions
authorizing the making of a grant existed; and upon the receipt
of such information the application was to be granted or re-
jected in strict conformity to law.   As respected grants to
heads of families or private persons, the "proceedings" culmi-
nating in a grant were required to be forwarded to the legis-
lative body of the territory for its approval, until which approval
grants were not to be definitively valid, while grants to con-
tractors for the colonization of many families required the ap-
proval of the supreme government, to whom the proceedings
were to be sent for its action.

Concerning the fourth article or section of the regulations
this court said, in *Arguello* v. *United States*, 18 How. 539, 543:
" By the fourth section the governor, being thus informed,
may 'accede or not' to the prayer of the petition.   This was
done in two ways; sometimes he expressed his consent by
merely writing the word 'concedo' at the bottom of the expe-
diente; at other times it was expressed with more formality, as
in the present case.   But it seldom specified the boundaries,
extent or conditions of the grant.   It is intended merely to
show that the governor has 'acceded' to the request of the
applicant, and as an order for a patent or definitive title in due
form to be drawn out for execution.   It is not itself such a doc-
ument as is required by the eighth section, which directs 'that
the definitive grant asked for being made, a document signed
by the governor shall be given to serve as a title to the parties
interested.'"

That the mere approval by the governor endorsed on a peti-
tion presented to him for a grant, before a reference to ascertain
the existence of the prerequisites to a grant, or indeed the action
of the governor antecedent to the actual execution by him of a
formal grant which was required by law, was not the equivalent

---

" 12.  Every new settler, after he has cultivated or occupied the land under
his stipulation, shall be careful to so show to the municipal authority, in
order to consolidate and secure his right to the property to enable him to
freely dispose thereof, after the proper record has been made."

of the grant, was clearly decided. The court, referring to a mere approval of a claim for land, said:

"The document of the 26th has none of the characteristics of a definitive grant. It shows that only the governor assents that the petitioner shall have a grant of land called 'Las Pulgas.' It describes no boundary, and ascertains no quantity. It contemplates a 'corresponding patent,' and does not purport itself to be such a document."

In *Hornsby* v. *United States*, 10 Wall. 224, the court considered the requirement of article 5 of the regulations. It was declared to have been the duty of the governor, and not of the grantee, to submit to the legislative body of a territory of the Republic of Mexico, for its approbation, grants issued by the governor; that by a grant, regular in form and of which archive evidence existed, a title of some kind passed to the applicant, and that, as respected such a grant, under the powers conferred on the court by the California act, a failure to obtain juridical possession or the approval of the departmental assembly, prior to the treaty of cession, did not operate to forfeit the title of the grantee or prevent a confirmation of a claim based on such grant. Whether this rule applies under the act of March 3, 1891, is one of the questions embraced in the propositions which we have postponed considering and as to which therefore we presently intimate no opinion whatever.

The "proceedings" which by article 5 of the regulations were to be forwarded to the legislative body were termed an expediente. What was embraced in the expediente is thus stated in *United States* v. *Knight's Adm'r*, 1 Black, 227, 245:

"When complete an expediente usually consists of the petition, with the diseño annexed; a marginal decree, approving the petition; the order of reference to the proper officer for information; the report of that officer in conformity to the order, the decree of concession and the copy or a duplicate of the grant. These several papers—that is, the petition with the diseño annexed, the order of reference, the informé, the decree of concession and the copy of the grant, appended together in the order mentioned—constitute a complete expediente within the meaning of the Mexican law."

And in *United States* v. *Larkin*, 18 How. 557, 561, this court, speaking of the final order or decree by a governor exhibiting favorable action upon an application, it was expressly declared that a "concession and direction constitute a part of the evidence of the title, or, according to the Mexican vocabulary, a part of the 'expediente.'"

In *Fuentes* v. *United States*, 22 How. 443, the nature and importance of an expediente was commented upon. In that case confirmation was sought of a purported grant without the production of an expediente. The court said (p. 453):

"The case, then, stands altogether disconnected from the archives, and exclusively upon the paper in the possession of Fuentes. It has no connection with the preliminary steps required by the act of Mexico of the 18th of August, 1824, or with the regulations of November 28, 1828. It is deficient in every particular—unlike every other case which has been brought to this court from California. There was no petition for the land; no examination into its condition, whether grantable or otherwise; none into the character and national status of the applicant to receive a grant of land; no order for a survey of it; no reference of any petition for it to any magistrate or other officer, for a report upon the case; no transmission of the grant—supposing it to be such—to the departmental assembly or territorial legislature, for its acquiescence; nor was an expediente on file in relation to it, according to the usage in such cases.

"All of the foregoing were customary requirements for granting lands. Where they had not been complied with, the title was not deemed to be complete for registration in the archives, nor in a condition to be sent to the departmental assembly for its action upon the grant. The governor could not dispense with them with official propriety; nor shall it be presumed that he has done so, because there may be, in a paper said to be a grant, a declaration that they had been observed, particularly in a case where the archives do not show any record of such a grant."

That the proceedings evidenced by the expediente may be examined in passing upon the claim of a grant in fee was expressly adjudicated in *De Haro* v. *United States*, 5 Wall. 599.

VOL. CLXXVII—8

Speaking of the execution of a grant in duplicate, it was said in *United States* v. *Osio,* 23 How. 273, 279 :

"Grants under the colonization laws were usually issued in duplicates, one copy being designed for the party to whom it was made, and the other to remain in the archives to be transmitted with the expediente to the departmental assembly for its approval. They were in all respects the same, except that the copy left in the office, sometimes called the duplicate copy, was not always signed by the governor and secretary, and did not usually contain the order directing a note of the grant to be entered in the office where land adjudications were required to be recorded."

As shown in the excerpt of article 9 of the regulations of 1828, it was required that a record should be made of the applications presented and grants made. Concerning this provision, this court in the case last cited said (p. 279):

"Adjudications of land titles were required by the Mexican law to be recorded. That requirement, however, was regarded as fulfilled, according to the practice in the department of California, when a short entry was made in a book kept for the purpose, specifying the number of the expediente, the date of the grant, a brief description of the land granted, and the name of the person to whom the grant was issued."

Again, referring to article 9, in *United States* v. *Bolton,* 23 How. 341, this court said (p. 350):

"Sec. 11" (9 ?) "directs that a proper record shall be kept of all the petitions presented and grants made, with maps of the lands granted.

"This record is the evidence of the grant. It being made, the governor (sec. 8) shall sign a document and give it to the party interested to serve as a title, wherein it must be stated that said grant (to wit, *the record*) is made in exact conformity with the provisions of the laws. In virtue of this document issued to the party, possession of the lands shall be given. But the document is not sufficient of itself to prove that the governor has officially parted with a portion of the public domain and vested the land in an individual owner. This must be established before the board of commissioners by record evidence,

as found in the archives, or which had been there and has been lost."

As instructive upon the point now under consideration we quote from the opinion delivered in *Pico* v *United States*, 2 Wall. 279, 281 :

"The regulations of 1828, which were adopted to carry into effect the colonization law of 1824, prescribed with great particularity the manner in which portions of the public domain of Mexico might be granted to private parties for the purposes of residence and cultivation. It is unnecessary to state the several proceedings designated, as they have been the subjects of frequent consideration in previous opinions of this court. All of them, from the petition of the colonist or settler to the concession of the governor, were required to be in writing, and when the concession was made, to be forwarded to the departmental assembly for its consideration. The action of that body was entered with other proceedings upon its journals, and these records, together with the documents transmitted to it, were preserved among the archives of the government in the custody of the secretary of state of the department. The approval of the assembly was essential to the definitive validity of the concession, and when obtained a formal grant was issued by the governor to the petitioner. The regulations contemplated an approval to precede the issue of the formal grant; so when the grantee received this document the concession should be considered final. For a long time after the adoption of the regulations this course of proceeding was followed; but afterwards, and for some years previous to the conquest, a different practice prevailed, and the formal title papers were issued without waiting for the action of the assembly, a clause being inserted to the effect that the grant was subject to the approval of that body. Of the petitions presented and grants issued, whether before or after the approval of the assembly, a record was required to be kept in suitable books provided for that purpose.

"As will be perceived from this statement, it was an essential part of the system of Mexico to preserve full record evidence of all grants of the public domain, and of the various

proceedings by which they were obtained. When, therefore, a claim to land in California is asserted under an alleged grant from the Mexican government, reference must, in the first instance, be had to the archives of the country embracing the period when the grant purports to have been made. If they furnish no information on the subject, a strong presumption naturally arises against the validity of the instrument produced, which can only be overcome, if at all, by the clearest proof of its genuineness, accompanied by open and continued possession of the premises."

In *Peralta* v. *United States*, 3 Wall. 434, there was considered the validity of an alleged grant claimed to have been made in the early part of 1846. The grant was attempted to be established by the introduction in evidence, from private hands, of an expediente, embracing documents exhibiting the proceedings had preliminary to the making of the alleged grant, including an order of the governor, based upon the report of a prefect, that a title issue, and parol proof of the execution of a formal grant. In the course of the opinion affirming the decree of the district court rejecting the grant, the court reiterated former declarations, saying (p. 440):

"The colonization regulations of 1828 constitute the 'laws and usages' by which the validity of a Mexican title is to be determined. It is not important to restate the nature and extent of those regulations, for they have been so often commented on that they are familiar to the profession. The Mexican nation attached a great deal of form to the disposition of its lands, and required many things to be done before the proceedings could ripen into a grant. But the important fact to be noticed is, that a *record* was required to be kept of whatever was done. This record was a guard against fraud and imposition, and enabled the government to ascertain with accuracy what portions of the public lands had been alienated. *The record was the grant,* and without it the title was not divested. The governor was required to give a document to the party interested, which was evidence of title, and enabled him to get possession; but this 'titulo' did not divest the title, unless record was made in conformity with law."

The solemnity of juridical possession as connected with the investiture of a private person with a complete and perfect title to public lands of Mexico has been commented upon in various decisions of this court. *Malarin* v. *United States*, 1 Wall. 282; *Graham* v. *United States*, 4 Wall. 259; *Van Reynegan* v. *Bolton*, 95 U. S. 33; *United States* v. *Pico*, 5 Wall. 536, and *More* v. *Steinbach*, 127 U. S. 70.

In *Malarin* v. *United States*, discussing the claim of the execution of an alleged grant of public lands in the territory of California in 1840, the court said (p. 289):

"When the grant to Pacheco was issued there still remained another proceeding to be taken for the investiture of the title. Under the civil, as at the common law, a formal tradition or livery of siesin of the property was necessary. As preliminary to this proceeding the boundaries of the quantity granted had to be established, when there was any uncertainty in the description of the premises. Measurements and segregation in such cases, therefore, preceded the final delivery of possession. By the Mexican law various regulations were prescribed for the guidance, in these matters, of the magistrates of the vicinage. The conditions annexed to the grant in the case at bar required the grantee to solicit juridical possession from the proper judge. In compliance with this requirement, within four months after the issuance of the grant, he presented the instrument to the judge of the district, and requested him to designate a day for delivering the possession. The judge designated a day, and directed that the adjoining proprietors be cited, and that measures and counters be appointed. On the day designated the proprietors appeared, and two measurers and two counters were appointed and sworn for the faithful discharge of their duties. A line provided for the measurement was produced, and its precise length ascertained. The measurers then proceeded to measure off the land, the judge and the proprietors accompanying them. The measurement being effected, the parties went to the center of the land, and there the judge directed the grantee to enter into the possession, which he did, and gave evidence of the fact 'by pulling up grass and making demonstrations as owner of the land.' Of the various steps thus taken, from the

appointment of the day to the final act of delivery, a complete record was kept by the judge, and by him transmitted to the grantee after being properly entered upon the ' book of possessions.' "

It appears from the adjudications of this court that the formal grants made to land in the territory of California enumerated conditions attached to the grant, in seeming compliance with the spirit if not the letter of the Mexican colonization law, and with the exactions of the regulations adopted to execute the same. It certainly cannot be questioned that, under Spanish dominion, the public lands were not granted in the first instance, in fee, to settlers or colonists, freed from conditions. As said by this court in *Chaves* v. *United States*, 168 U. S. 177, 188, speaking of the Spanish law in force in 1788:

" Lots and lands were distributed to those who were intending to settle, and it was provided that ' when said settlers shall have labored in said settlements during the space of four years, they are hereby empowered, from the expiration of said term, to sell the same and freely to dispose of them at their will as their own property.' But confirmation by the audiencia, or the governor if recourse to the audiencia was impracticable, after the four years had elapsed, was required in completion of the legal title."

The constituents of the preliminary papers leading up to a grant and of the grant itself, and the distinction between them, to which attention had been so often directed by this court, was pointedly reiterated in the statement of the case made by Mr. Chief Justice Fuller in *Ainsa* v. *United States*, 161 U. S. 208, 219, as follows:

" An expediente is a complete statement of every step taken in the proceedings, and a testimonio is the first copy of the expediente. A grant of [or?] final title paper [s] is attached to the testimonio and delivered to the grantee as evidence of title, and entry is made at the time in a book called the Toma de Razon, which identifies the grantee, date of the grant and property granted."

It is manifest from the foregoing review of the decisions under the California act, that it was held, that in order to vest an

applicant under the regulations of 1828, with title in fee, either absolute and perfect, or conditional and imperfect, to public land, substantial compliance with the preliminary requisites to a grant was essential, it was necessary that a grant should be evidenced by an act of the governor, clearly and unequivocally conveying the land intended to be granted, and a public record, in some form, was required to be made of such grant.

As a corollary from the foregoing, it of course follows that the action of the legislative body could not lawfully be invoked for the approval of a grant, unless the expediente evidenced action by the governor, unambiguous in terms as well as regular in character.

. Although it be assumed that there was a settled practice in New Mexico prior to the treaty of cession, to evidence a grant of land by a decree of the governor entered upon the reports made to him, without the execution of an independent and formal grant, such assumption would not avail in this case. For, undoubtedly, it would be essential in a paper of the character referred to that it should indicate the land to which the grant referred and the persons to whom it was made, and, further, that there should be a record thereof. It is patent that the regulations contemplated that the original "proceedings" or expediente which were to be forwarded to the departmental assembly, if evidencing the fact that a grant had actually been made, should remain in the custody of the public officials, and that such "proceedings" to be complete should exhibit the action taken by the governor after the ascertainment of the prerequisites required by law.

Inspecting, then, the alleged granting papers on the assumption of their genuineness, we proceed to determine whether or not they justify the contention that thereby a valid grant of any kind was made. In doing so let us consider, first, the form of the alleged granting papers, and, second, their substance.

The only ground for contending that there was a grant by the governor must rest on the inference that the indorsement by the official named, on the petition of Santistevan, manifested the purpose of the governor to grant an absolute title to land, and operated to constitute a formal deed of grant. The indorsement thus referred to is as follows:

"SANTA FÉ, *December* 31, 1845.

"To the prefect of the district, that he ascertain whether the land applied for has an owner, and cause the corresponding justice to deliver the land referred to by the petitioner. ARMIJO.

"JUAN BAUTISTA VIGIL Y ALARID, *Secretary*."

But, under all the authorities to which we have referred the mere endorsement by a Mexican governor of action on the petition, before any of the prerequisite steps mentioned in the regulations of 1828 had been taken to determine whether as to the land and the applicants the power to grant might be exercised, was treated as a mere reference by the governor to ascertain the preliminary facts required to justify an approval of an application, and not as having force and effect as an actual grant of title to the land petitioned for. Under the decisions referred to, it cannot be doubted that the regular practice was deemed to be the execution of a formal deed of grant, following a decree acceding to the application, after reports made as to the results of the investigation directed to be had as required by law.

Whilst, as we have said, it may have been the practice in New Mexico for the governor not to make an independent, formal grant, but, after the receipt of reports from subordinate officials, to indorse a decree of concession or grant upon the papers evidencing the "proceedings" in the matter, such practice would not justify the conclusion that the mere approval indorsed on a petition, amounting but to a direction to take the necessary steps for the ascertainment of needed information, should be treated as dispensing with any manifestation by the governor of his intention to grant a title to land after the requisite information had been communicated to him. It is manifest that the prefect to whom the indorsement by the governor on the petition was addressed did not consider it as a grant of title to the tract of land in question, since he directed the justice of the peace, if the land was vacant and third parties would not be injured thereby, to "proceed to grant them of the land an abundance of *what each can cultivate*, under the condition that they inclose the same with a regular fence, in order to prevent damage, and that they do not obstruct the road, pastures and water-

ing places, and with notice that they should keep arms sufficient for their defense."

Now, it is undoubted that the documents executed by the prefect and the justice of the peace fairly import that those officials assumed authority to grant something as respected the land in question, either title or a right of possession for purposes of cultivation, but it is beyond controversy that the officials referred to did not, in 1845, possess power to grant the title to public lands. *Hays* v. *United States*, 175 U. S. 248; *Crespin* v. *United States*, 168 U. S. 208; *United States* v. *Bergere*, 168 U. S. 66. If, however, the subordinate officials referred to presumed to act on behalf of the governor in making a grant of title, the failure of the latter to subsequently ratify their action rendered their acts nugatory. *United States* v. *Bergere, supra.*

As a grant of title by the governor was a prerequisite to the conferring of juridical possession, of necessity the delivery thereof must have conformed to such precedent grant, and the mere act of possession cannot in any view have the force and effect of a grant. The document evidencing possession certainly formed no part of the "proceedings" or expediente which was required to be transmitted to the legislative body for its decision, approving or disapproving action taken by the governor antecedent to the giving of possession.

Passing, however, from the mere question of form and considering the substance of things, can the papers relied upon be treated as constituting a grant of title to the land in question? Certainly, the adjudications of this court upon the regulations of 1828, from the beginning, have established the doctrine that a grant of Mexican land could not be confirmed unless there had been at least a reasonable compliance with the requirements of those regulations. Now, the Mexican law under which, if at all, a grant of this land could have been made, required the governor to be informed both as to the capacity of the individual under the law to receive the grant, and as to whether the land petitioned for was in a condition for grant. And whilst exacting that the governor should thus have the means of information in order to enable him to form a judgment, the law pointed out the officials to whom he should refer the petition for examination and report on these subjects.

Now, in the case before us, that the governor at the inception of the proceedings was not sufficiently informed, either as to the land or the applicants, to take final action upon the petition, is patent on the face of the documents. Thus, the petition does not designate who were the "five" associates of Santistevan, and the governor in his indorsement requires the prefect to ascertain the condition of the land. Further, though the prefect was not informed, either by the petition or the indorsement of the governor, as to who were the petitioners to whom delivery of the land was to be made, he remained ignorant on the subject, and directed the justice of the peace to ascertain the condition of the land, and to grant to the "petitioners" (asserted in the petition of Santistevan to be *six* in number) an abundance of what each could cultivate of the land, under certain prescribed conditions. We find, however, the justice of the peace assuming to grant to "*five* petitioners" jointly, either a title to or the right of possession of, all the land within described boundaries.

Regarded as a grant of title, the documents relied upon import, contrary to the letter and spirit of the regulations, that it was a matter of no consequence to what particular individuals a grant was to be made, and that Santistevan might designate, at his pleasure, the persons to be placed with himself in possession. But, by article 3. of the regulations, the determination whether the conditions required by the colonization law existed, "both as regards the land and the applicant," was imposed upon the executive head of the territory. And as already shown, the grant could not have been created by the mere conferring of juridical possession, since the authority to give possession was necessarily derived from and must have conformed to a precedent grant.

It is manifest that the indorsement of Governor Armijo, considered by itself or in conjunction with the petition, failed to identify the petitioners, and did not, in terms, purport to grant title to land. As Santistevan petitioned that the grant be made by the governor "in the name of the high powers of our Mexican Republic," it is not permissible to infer that the governor intended to delegate to subordinate officials the power to decide whether an absolute or any title to the land petitioned for should

be granted, or to determine what portion thereof should be granted. The reasonable interpretation of the act of the governor would appear to be that he intended either to license the occupation of land within the prescribed limits for cultivation, or that he desired an examination and report to be made, with a delivery of temporary possession, pending further action on his part.

When it is borne in mind that the application of Santistevan purports to have been made at a time when hostilities were impending between Mexico and the United States, and the territory of New Mexico was undoubtedly in a disturbed condition, its citizens in all probability preoccupied with preparations for an impending clash of arms, the inference from the documents we have been considering is not unwarranted that but a mere temporary possession or license was intended by the prefect and justice of the peace to be conferred upon the applicants. Such an hypothesis would account for the long delay following the direction of the prefect to the justice of the peace, bearing date January 3, 1846, and the delivery of possession on the 20th of March following. And it is to be remarked that such a possession as could have been had of the land in question under then existing circumstances, during the short time intervening the asserted delivery of possession and the conquest of the country by the American forces, would have been insufficient to have constituted even an equity in favor of the alleged grantees, which this court could recognize were it clothed with the broad powers conferred by the California act. *Peralta* v. *United States,* 3 Wall. 434, 441. It may be added that the record fails to satisfactorily establish any occupancy or cultivation prior to the conquest, and but trifling cultivation thereafter, and the latter by a portion only of the alleged grantees.

To summarize. In the documents presented as establishing title in the alleged original grantees, there is an entire disregard of the requirements of the regulations of 1828, and the proceedings do not warrant the finding that the acts of the prefect and of the justice of the peace were ever reported to or received the approval of the governor, or that the latter official ever made a grant of title. The major portion of the documents claimed

to constitute title, if regular, properly constituted part and parcel of an expediente belonging to the archives. They, however, bear no indorsement to indicate that they had ever been among public archives prior to their production in 1872 from private custody for filing in the office of the surveyor general of New Mexico. So, also, no evidence was introduced tending to show that any sort of official record had ever been made of a grant of title to the land in controversy, while the tenor of the act of possession forbids the inference that any formal grant was ever executed by the governor. The case is therefore without the principle of various decisions of this court where, with repect to a formal grant, introduced in evidence, *complying with the requirements of the regulations,* but whose authenticity was disputed, the case was remanded to the lower court to permit the introduction of evidence, if such could be produced, to establish that archive evidence of the grant once existed. One of the prerequisites for the introduction of secondary evidence of title is proof that a " grant was obtained and made in the manner the law required." *United States* v. *Castro,* 24 How. 346, 350.

Unless it be assumed that the Mexican Government was indifferent as to the disposition of its lands, and that anybody and everybody possessed power to convey them, as a matter of course, to whoever chose to ask for them, proceedings such as those we have reviewed cannot be treated as having had the effect of divesting the Republic of Mexico of title to a portion of its public lands.

Sustaining, as we do, the first two contentions urged by the Government, it becomes unnecessary to consider or pass upon the others which were pressed upon our attention. As a consequence of the foregoing reasons, it results that the claim should have been rejected by the Court of Private Land Claims, and that because it erroneously confirmed the alleged grant, the decree made below should be

*Reversed and the cause remanded with instructions to reject the claim and dismiss the petition, and it is so ordered.*

Mr. Justice Brewer and Mr. Justice Brown concurred in the result.

Mr. Justice Shiras and Mr. Justice McKenna dissented.