## WHITNEY *v.* UNITED STATES.

APPEAL FROM THE COURT OF PRIVATE LAND CLAIMS.

No. 133. Argued March 1, 1901.—Decided April 15, 1901.

In reviewing questions arising out of Mexican laws relating to land titles, it is difficult to determine with anything like certainty what laws were in force in Mexico at any particular time prior to the occupation of the country in 1846–1848.

Looking through the provisions to which its attention has been called the court finds nothing in them providing in terms, or by inference, for a general delegation of power by the supreme executive to the various governors to make a grant like the one set up in this case; and it holds that the appellants have not borne the burden of showing the validity of the grant which they set up, either directly, or by facts from which its validity could be properly inferred within the cases already decided by this court.

THE appellants in this case come here on appeal from a judgment of the Court of Private Land Claims rejecting their claim, which arose under a grant of land in New Mexico called La Estancia grant, consisting of some 415,000 acres, made in 1845 by Governor Armijo to one Antonio Sandoval, under whom they claim. Upon the trial it appeared that Sandoval in 1845 was a Mexican citizen of high distinction residing in the Territory of New Mexico. By petition, dated December 5, 1845, and presented on the 7th of that month, Sandoval petitioned the governor of New Mexico for a grant of land in the name of the supreme authority of the Mexican nation, the land being described in the petition, and the petitioner stating that it was

vacant land in a condition of *mortmain,* and might be granted without prejudice to any third party. He stated in his petition that he had for the last thirty years and more been rendering services to the country, both by personal service and property, and without ever having been paid anything in the way of compensation for such services, and in consideration of all of which he asked and prayed the governor for the sake of justice to accede to his prayer. On December 7, 1845, Governor Armijo granted the petition, and placed the following memorandum thereon:

" This government being convinced of the valuable services Don Antonio Sandoval has rendered, and is now rendering the country, as well during the time to which he refers as also during the six years he served administering the prefecture of the second district, with the salary of one thousand five hundred dollars, of which not even a half real has been paid to him, the sum due him amounting to nine thousand dollars, and the statements in this petition being true, I do, in the exercise of the power in me vested by the-laws, and also in consideration of all the premises and as a just title acquired, make to him the grant for the land he solicits, with all the dimensions and pasture land he asks, that he may enjoy the same in the name of the supreme government of the Mexican nation and under my concession, free and exempt from all tax or tribute.

"Manuel Armijo."

Following the memorandum is a written certificate signed by the comptroller of the departmental treasury of New Mexico and acting treasurer of the same, certifying that Antonio Sandoval, during the period of forty years, as appears from the record of the books of the treasury, has been serving the nation as a military and civil officer, and has loaned during that time numerous sums of money to the nation without receiving one half real interest, and that there are now due him large sums as appears from the interest entries in the office and the evidences in possession of the parties interested on account of salaries and loans. Then follows the written certificate of Jose Baca y Ortiz, dated at La Estancia, December 15, 1845, in which

he certifies that on that day he, accompanied by witnesses, placed Antonio Sandoval, *through his agent, Juan Antonio Aragon,* in juridical possession of the granted lands.

On July 8, 1848, Sandoval conveyed, by a deed of gift, the above described land to his nephew, Gervacio Nolan. This conveyance was acknowledged before the clerk of the county of Bernalillo, Territory of New Mexico, on July 8, 1848.

After the passage of the act of Congress, July 22, 1854, establishing the office of surveyor general in New Mexico, and on July 12, 1855, Nolan, the grantee of Sandoval, filed in the office of the surveyor general the papers above described, upon which he asked for the approval of that officer, and that he would recommend the grant for confirmation by Congress. Nolan died in 1858, before anything was done in regard to his petition. After his death his widow and children, by guardian, applied to the surveyor general, stating the fact of his death, and asked that the grant of the land should be confirmed to them as the present owners, and that a patent should be issued in their favor. Testimony was taken in 1861, relating to the petition, before the then surveyor general, but no final action was had in the case until it was submitted to Surveyor General Proudfit, who, on January 4, 1873, reported that in his opinion the title was perfect in the legal representatives of Nolan, deceased, and recommended that it be confirmed by Congress. Congress did not, however, confirm the grant, and under instructions from the Commissioner of the General Land Office the case was reëxamined by Surveyor General Julian, who, in a report to the Commissioner, dated July 21, 1886, recommended the rejection of the claim by Congress for the reasons therein stated by him. This report was concurred in by the Commissioner, and by him transmitted on December 17, 1886, to Mr. Lamar, Secretary of the Interior. No further action seems to have been taken. The appellants herein take title from the widow and children of Nolan by conveyance dated September 23, 1880.

*Mr. John H. Knaebel* for appellants. *Mr. Ernest Knaebel* was on his brief.

Mr. *Matthew G. Reynolds* for the United States. *Mr. Solicitor General* was on his brief.

Mr. Justice Peckham, after making the above statement of facts, delivered the opinion of the court.

The judges of the court below, while rejecting the claim of appellants, differed widely in regard to the grounds upon which such rejection should be placed. Mr. Justice Sluss, in an opinion that was concurred in by Mr. Justice Fuller, said that the case was to be decided under the Mexican colonization law of August 18, 1824, and the regulations of November 21, 1828, which in his judgment had not been totally repealed by the law of April 4, 1837, and the grant, being subject to the first named law and to the regulations above mentioned, could not be valid for a greater quantity than eleven square leagues, nor become a perfect title until the grant had been approved by the departmental assembly.

It appears that eleven square leagues would embrace about 50,000 acres of land, and hence a grant of 415,000 acres would, under the law and regulations, be far beyond the power of the officials to make to any one person.

Mr. Justice Murray, while concurring in the conclusion to reject the claim, was of opinion that the law of 1824 and the regulations of 1828 had been entirely repealed by the law of April 4, 1837, but he did not think that the governor had the power merely as representative of the supreme executive to make the grant, and there was no evidence of any special power having been delegated to him.

Mr. Chief Justice Reed also concurred in the conclusion to reject the claim but did not agree with all that was said in the opinion of Mr. Justice Sluss, being himself of opinion that, while the law of 1824 was repealed by that of 1837, the regulations of 1828 were not thereby wholly repealed. He thought that the grant in this case was made, not under the law of 1824, but under the regulations of 1828; that the law regulated the matter of the disposition of the public lands *within the States*, and conferred upon the executive the power to make all necessary

regulations for the disposition of such lands *within the Terri-tories*, of which New Mexico was one, and the question in his judgment was, not whether the law remained in force but whether the regulations continued operative when the grant was made; that it was manifest the law which governed the matter within the States might be repealed without at all affect-ing the regulations established by the executive governing the same subject within the Territories. Being subject to those regulations, we suppose the quantity of the grant was an insuper-able bar to its validity, in the view of the Chief Justice.

Mr. Justice Stone dissented from the decree rejecting the claim, and was of opinion that the making of the grant in ques-tion was within the competency of the supreme executive, and that Governor Armijo was his appropriate ministerial agent in its execution.

In reviewing questions arising out of Mexican laws relating to land titles we recognize what an exceedingly difficult matter it is to determine with anything like certainty what laws were in force in Mexico at any particular time prior to the occupation of the country by the American forces in 1846–1848. This dif-ficulty exists because of the frequent political changes which took place in that country from the time the Spanish rule was first thrown off down to the American occupation. Revolutions and counter-revolutions, empires and republics, followed each other with great rapidity and in bewildering confusion, and emperors, presidents, generals and dictators, each for a short period, played the foremost part in a country where revolution seems during that time to have been the natural order of things. Among the first acts of each government was generally one re-pealing and nullifying all those of its predecessors.

If, however, the validity of this grant were to be decided under the provisions of the colonization law of 1824, and the regulations passed in 1828, it seems to us there would be little difficulty in determining that the appellants had failed to make out their case. The provisions of the act of 1824 were plainly violated in this grant, because it contained more than eleven square leagues. This was prohibited by that law. Reynolds'

Compilation of Spanish & Mexican Land Laws, pp. 121, 122, sec. 12; Hall's Mexican Law, p. 149, sec. 498.

And also, before the grant in question was made, there had been a previous one, dated November 28, 1845, conveying to Sandoval the land embraced in what was called the Bosque del Apache grant, which also exceeded eleven square leagues in extent, the grant being made by the same governor (Armijo), although juridical possession was not delivered until March 7, 1846. Having obtained a grant of more than eleven square leagues before he made his petition for the grant now in issue, he had acquired all that the law of 1824 permitted him to take, and the subsequent grant was not valid. *United States* v. *Hartnell*, 22 How. 286.

Another objection to the title is that there is no record of its existence in the archives of New Mexico. Although no question is made as to the genuineness of the papers set forth in the foregoing statement of fact, namely, the petition of Sandoval, its allowance by Governor Armijo, the certificate of the comptroller and acting treasurer, and the certificate of the delivery of juridical possession by the justice of the peace, yet none of these came from the archives of the country, and there is no record that the departmental assembly ever concurred in the grant, as is necessary under the law of 1824. Reynolds, p. 142, sec. 5. If the approval of that body could not be obtained, the governor was to report to the supreme government, forwarding the proceedings in the matter for its consideration. Sec. 6. Nothing of this kind appears in the archives or in the records of the assembly. Nor has there been produced even from the hands of the claimants any approval of the grant by the assembly. No matter how formal and complete the written documentary evidence of title may be, yet when coming from private hands it is insufficient to establish a Mexican grant if there is nothing in the public records to show that it ever existed. *Peralta* v. *United States*, 3 Wall. 434, 440. Mr. Justice Davis, in delivering the opinion of the court in that case, said:

"The Mexican nation attached a great deal of form to the disposaion of its lands, and required many things to be done before the proceedings could ripen into a grant. But the im-

portant fact to be noticed is, that a *record* was required to be kept of whatever was done. This record was a guard against fraud and imposition, and enabled the government to ascertain with accuracy what portions of the public lands had been alienated. *The record was the grant*, and without it the title was not divested. The governor was required to give a document to the party interested, which was evidence of title, and enabled him to get possession; but this ' titulo' did not divest the title, unless record was made in conformity with law."

The title here is incomplete because there is no evidence whatever of approval by the assembly, or, failing in that, any record of further proceedings to obtain the approval of the supreme government.

In *United States* v. *Teschmaker*, 22 How. 392, Mr. Justice Nelson said, at page 405 : " We do not say that the absence of the record evidence is of itself necessarily fatal to the proof of the title; but it should be produced, or its absence accounted for to the satisfaction of the court."

In *Berreyesa* v. *United States*, 154 U. S. 623, the court held that the case came within the principle of those cases in which it had decided adversely to claims made under alleged Mexican grants, all because it did not appear that a grant from the Mexican government had been " deposited and recorded in the proper public office among the public archives of the republic." See also *United States* v. *Ortiz*, 176 U. S. 422; *United States* v. *Elder*, 177 U. S. 104.

In this case, as we have said, there is no record or mention of the case in the archives in New Mexico. The papers came from private hands, the claimant Nolan presenting them to the surveyor general in 1855, when he applied to that officer for his recommendation to Congress for a confirmation of the grant. That they have remained in the surveyor general's office since that time does not make them a record or an archive of the government within the meaning of those cases above cited.

The certificate of Baca, the justice of the peace, certifying to his delivery of juridical possession to Sandoval on December 15, 1845, bears the indorsement that it was recorded in book letter B, pages 166, 167, and is certified to by the recorder Dona-

ciano Vigil at Santa Fé, November 17, 1849. This book has been lost, but it was kept in obedience to a provision contained in what is called the "Kearney Code," providing for the recording of papers brought to the recorder by parties, which affected or constituted their title to lands they claimed to own. The book was not an original archive of the country. The certificate of record indorsed upon the paper shows that it was produced from private hands, and no presumption that any papers relating to this grant were recorded in or placed among the archives of the government of New Mexico arises from the fact that a record of this paper was made pursuant to the provisions of the Kearney Code. There is no proof that this paper or any document connected with the grant under discussion had ever been delivered to the recorder for record and retained by him in his official custody from 1849 until it had been turned over to the custody of the surveyor general upon the creation of that office in 1854. The language contained in the report of Surveyor General Proudfit would negative any such presumption, because he says that the papers were filed in his office July 12, 1855, by Gervacio Nolan, the claimant himself. The fact, however, would have been immaterial in any event. The paper would not have been a document found in the records or archives of New Mexico, because it came from private hands and was by the claimant delivered to the recorder, and his keeping it thereafter and turning it over to the surveyor general would not have constituted it a record or a paper found among the archives and turned over to that officer.

It does appear from the evidence that there may have been some loss or destruction of papers which constituted a part of the records or archives of New Mexico in the possession of the territorial librarian in the year 1869 or 1870. The history of the transaction is stated by the witness Bond, and it would seem from his account that it was extremely doubtful whether any really important papers relating to grants of land had in fact been destroyed, although some of them may have been. Unless we should regard this possibility as a sufficient excuse in every case of a land grant in New Mexico for the failure to show any archive title or record of title of such

grant, it cannot be admitted in this particular case. That it is not a sufficient excuse has been decided by this court. *United States, Applts.*, v. *Castro et al.*, 24 How. 346. The appellants did prove by the witness Tipton, whose great experience in connection with the surveyor general's office in New Mexico is well known, that he had not seen in the archives of the government any record of grants made by Armijo or signed by him, although the witness knew nothing about the condition of the archives prior to the spring of 1876. We think this is insufficient to show the destruction of all archives pertaining to grants made by Armijo about this time (1845).

Taking all these objections to the title into consideration we think it clear that no case for confirmation under the colonization law of August, 1824, and the regulations of 1828 was made out.

In the early history of these Mexican land titles it had been supposed that the colonization law and the regulations above mentioned were all that were in force in Mexico after their dates. *United States* v. *Cambuston*, 20 How. 59, 63; *United States* v. *Vallejo*, 1 Black, 541, 552; *United States* v. *Vigil*, 13 Wall. 449, 450.

Subsequently, the claim was urged that that law and the regulations had been repealed by virtue of the law of April 4, 1837. Reynolds, p. 222. See also law of April 17, 1837, p. 224 of Reynolds' Compilation.

The claim was urged by way of argument by counsel, and referred to by Mr. Justice Lamar in his opinion in *Interstate Land Grant Company* v. *Maxwell Land Grant Company*, 139 U. S. 569, 578. Again, in *United States* v. *Coe*, 170 U. S. 681, 696, Mr. Justice McKenna, in speaking of the colonization law of August 18, 1824, said that "by a law passed April 4, 1837, all colonization laws were certainly modified and may be repealed."

The weight of the argument of counsel for appellants rests upon the assumption and assertion that this grant was not made under the law of 1824 or the regulations of 1828, nor under the law of 1837 above mentioned, but that it was made by the supreme executive of Mexico through his trusted minister and agent, Governor and Commandant-General Manuel Armijo,

who in making such grant was not restricted by any prescribed rules or limitations. This broad proposition counsel has sought to maintain by reference to the various acts of Mexico subsequent to 1828, and up to the making of this grant.

Treating Armijo as the *alter ego* in New Mexico of the supreme executive of Mexico, and claiming for the latter full and absolute power to dispose of the public lands in accordance with the views held by that officer, counsel ask that the same presumption of the validity of grants made by Governor Armijo should be indulged, which was accorded to the grants of certain officials in the Louisiana and Florida cases, herein referred to. We think no such presumption ought to obtain in this case.

In *United States* v. *Cambuston, supra*, Mr. Justice Nelson, in speaking of the difference between the cases involving Spanish titles in the Territories of Louisiana and Florida, such as *United States* v. *Arredondo*, 6 Pet. 691, 729 ; *Delassus* v. *United States*, 9 Pet. 117, 134 ; *United States* v. *Peralta*, 19 How. 343, 347, and those which involved Mexican titles, said :

"But no such presumptions are necessary or admissible in respect to Mexican titles granted since the act of the 18th of August, 1824, and the regulations of the 21st of November, 1828. Authority to make the grants is there expressly conferred on the governors, as well as the terms and conditions prescribed, upon which they shall be made. The court must look to these laws for both the power to make the grant, and for the mode and manner of its exercise; and they are to be substantially complied with, except so far as modified by the usages and customs of the government under which the titles are derived, the principles of equity, and the decisions of this court. 17 How. 542."

The case was decided under the act of Congress of the 3d of March, 1851, to adjudicate private land claims arising under our treaty with Mexico, and the decision, as is seen from the above extract, proceeds upon the assumption that the law of 1824 and the regulations of 1828 furnished the rule of decision. Their existence is denied by counsel for the appellants, and it is upon the assumption of their non-existence that his argument rests. Assuming, however, that the law and regulations were

not in force, we still cannot base a presumption that the governor was authorized by the supreme executive to make the grant simply because the governor exercised the power. The difference between the act relating to Spanish titles to lands above referred to and the act of 1891 under which Mexican titles to lands have been examined by the Court of Private Land Claims, and by this court, is clearly recognized and enforced in *United States* v. *Ortiz,* 176 U. S. 422. In that case it was held that under the provisions of the act establishing the Court of Private Land Claims, (sec. 13, act of March 3, 1891, c. 539 ; 26 Stat. 854,) the burden of showing the existence of the grant was upon the person claiming under it, and that no presumption of authority on the part of the granting officer existed, as in the case of the above mentioned territories. This last case was approved in the *Elder* case, 177 U. S. 104, where it was again held that the claimant must prove his title by a preponderance of evidence, and no presumption of authority existed.

And in *Hays* v. *United States,* 170 U. S. 637, 647, 648, this difference is also pointed out by Mr. Justice White. Speaking of the act of 1891, he said :

" But in the act of 1891 the court is required to be satisfied not simply as to the regularity *in form,* but it is made essential before a grant can be held legally valid that it must appear that the title was 'lawfully and regularly derived,' which imports that the court must be satisfied, from all the evidence, that the official body or person assuming to grant was vested with authority, or that the exercise of power, if unwarranted, was subsequently lawfully ratified." Page 648.

We are not satisfied that there was a general power on the part of the governor of a territory at any time to make a valid grant of lands in all cases and simply as the agent of the supreme executive, such as is contended for by counsel for the appellants. No evidence that the governors legally had that power has been given other than the fact that they sometimes exercised it. It appears, however, that for some years prior to 1845 grants of land were made not only by governors, but even by alcaldes, prefects, justices of the peace, and by judges of first instance, so that, in the language of one of the judges of the

court below, "it was a poor officer, indeed, who did not assume to be able to dispose of the public domain belonging to the nation." Hence the reluctance to presume the validity of a power because of its exercise. It may be that in some particular period of those disturbed times, and up to 1846, the supreme executive of the Mexican nation exercised arbitrary and irresponsible power, and granted the public lands according to his own views of what was proper and needful for the nation, and upon occasion delegated such power to a governor, but the exercise of that kind of power was in violation of the ordinary and general laws which had been adopted by the nation, and no presumption that the supreme executive had delegated his power to a governor or political chief of a province or state can be indulged for the purpose of upholding a grant of land made by the governor in violation of the constitution or laws which had theretofore been adopted or passed.

Counsel also urges that such power is to be found in the "Bases of 1835," the "constitution of 1836," and the "Bases of 1843," not to speak of the "Plan of Tacubaya," and the attending laws or decrees, in which it is contended there are specific provisions plainly expressive of the intimate representative and ministerial relations which the governor and commandant general bore the supreme executive. It might be assumed that the relations between the supreme executive or Dictator and his governors and commandants general were intimate and confidential, but such relations of intimacy and confidence do not take the place of an actual delegation of power to the governors to make grants of this description; nor do we find any such delegation in the various provisions contained in the Bases of 1835 or of 1843 and the constitution above referred to. The governor does not assume to make the grant by virtue of any special or general delegation of authority to him by the supreme executive, but he asserts in his grant above quoted that he makes it "in virtue of the power in me vested by the laws," etc.

Section 10 of the "Bases for the New Constitution," law of October 23, 1835, Reynolds, p. 201, simply provides that the executive power of the departments shall reside in the gov-

ernors in subordination to the supreme executive of the nation. The same law divides the national territory into departments on the basis of population, etc., and provides that there shall be governors and departmental boards for the government of these departments. This obviously gives no authority to the governor to make a grant of the public lands within his territory according to his own unrestrained views of propriety. It does not assume to alter the general laws in relation to the disposition of the public lands or of the manner in which they shall be disposed of. The same may be said regarding the constitution of 1836, which entrusts the interior departments to the governors in subordination to the general government. Reynolds, pp. 203, 204. The law of March 20, 1837, Reynolds, p. 211, subdivision 17, p. 215, provides that the governors shall be the usual channels of communication between the supreme powers of the nation and the departmental councils (juntas), and between the latter and the officials of the department. This provision does not tend to show the power contended for.

In fine, looking through the provisions to which our attention has been called by counsel, and without specific reference to each one of them, we may say in regard to all of them that we find therein nothing providing in terms or by inference for the general delegation of power by the supreme executive (assuming that he himself had it) to the various governors to make a grant like this. The appellants are, therefore, compelled to show some specific delegation of authority from the supreme executive for making such a grant. If that were shown, we might say, following the case of *United States* v. *Castillero,* 23 How. 464, the other conditions therein mentioned being fulfilled, that the grant was a valid one and ought to have been confirmed by the court below, and within the case of *United States* v. *Osio*, 23 How. 273, if there had been a special delegation of power it would follow that the conditions contained in such special delegation must be fulfilled before title passed. The necessity for showing what the special power was becomes evident from these cases.

What we have already said as to the absence of all record in

the archives, relating to the grant, applies to the case as here considered.

Looked at from any point of view we do not think the appellants have borne the burden of showing the validity of their grant, either directly or by facts from which its validity could be properly inferred within the cases already decided by this court. The judgment of the court below must, therefore, be

*Affirmed.*