[No. B034790. Second Dist., Div. Two. Nov. 22, 1988.]

CITY OF LOS ANGELES, Plaintiff, Cross-defendant and
Respondent, v.
VENICE PENINSULA PROPERTIES, Defendant and Appellant.
THE STATE OF CALIFORNIA EX REL. STATE LANDS
COMMISSION, Defendant, Cross-complainant and Respondent, v.
SUMMA CORPORATION et al., Cross-defendants and Appellants.

1524

COUNSEL

Sherman L. Stacey for Defendant and Appellant.

James K. Hahn, City Attorney, Edward C. Dygert and Norman L. Roberts Assistant City Attorneys, for Plaintiff, Cross-defendant and Respondent.

O'Melveny & Myers, Jack B. Hicks III, Todd Littleworth, William A. Dorland, Hill, Farrer & Burrill, John N. McLaurin, William M. Betting and Steven W. Bacon for Cross-defendants and Appellants.

Washburn, Kemp & Wagensil and Edgar B. Washburn as Amici Curiae on behalf of Cross-defendants and Appellants.

John K. Van de Kamp, Attorney General, N. Gregory Taylor, Assistant Attorney General, Shunji Asari, Robert G. Collins and Nancy Alvarado Saggese, Deputy Attorneys General, for Defendant, Cross-complainant and Respondent.

OPINION

**COMPTON, J.**—On March 25, 1981, we filed an opinion in this case which directed reversal of a judgment of the trial court which had been entered in favor of the State of California (State) and its successor in interest, City of Los Angeles (City).

The thrust of the claim of the State and City and the judgment entered on that claim by the trial court was that a public trust easement existed on certain privately held property in what is known as the Ballona Lagoon.

Subsequently, the California Supreme Court granted hearing and rendered an opinion upholding the judgment of the trial court. That decision was ultimately overturned by the United States Supreme Court in an opinion filed April 17, 1984 (*Summa Corp.* v. *California* (1984) 466 U.S. 198 [80 L.Ed.2d 237, 104 S.Ct. 1751]). The matter was remanded to the Supreme Court of California "for further proceedings not inconsistent with [the opinion of the United States Supreme Court]."

On May 19, 1988, the California Supreme Court transferred the cause to this court "with directions to decide the appeal in the light of the decision of the United States Supreme Court."

Thereafter, we were advised that the City and State had negotiated a settlement with one of the property owners, Summa Corporation, and we were requested to dismiss the appeal.

Since the easement claim by the City and State affected property owners other than Summa Corporation, and since the dismissal of the appeal would have the effect of permitting the erroneous judgment entered by the trial court to stand, we denied the request and calendared the matter for oral argument.

Having heard the argument and reviewed our former opinion, the briefs previously filed, as well as the opinion of the United States Supreme Court, we conclude that the proper course of procedure is to adopt the language of our former opinion and remand the matter to the trial court and direct entry of judgment against the City and the State. The parties will then be free to effectuate any settlement agreement they care to make unfettered by the former judgment of the trial court.

At issue on this appeal is whether, by virtue of the so-called California Tidelands Trust Doctrine, the State and its successor in interest, the City, can assert an easement for commerce, navigation and fishery over land which was part of a Mexican land grant and patented by the United States government pursuant to the Act of 1851.[1] We hold that neither the State nor the City possess such an easement over the property in question here.

The instant case involves two lots which are depicted on a subdivision map as Lot C of the Del Rey subdivision, and Lot R of the Silver Strand subdivision. These lots underlie what is now popularly referred to as the Ballona Lagoon (Lagoon) located in the Marina Del Rey area of the city.

The Lagoon in its present configuration is a narrow elongated area covered by very shallow water and is separated from the ocean by a strand or bar of beach sand. Its entire length lies within 1,000 yards of the ocean. It connects to the Venice Canals[2] to the northwest and to the ocean channel entrance to Marina Del Rey on the southeast.

Historically, the name Ballona Lagoon referred to a much larger area than that covered by the property here involved and was part of what was once Rancho Ballona. That additional area is now dry land as a result of filling, development and natural conditions.

---

[1] The Act of 1851 was enacted by Congress to implement the treaty of Guadalupe Hidalgo, by which treaty the government of Mexico ceded to the United States the area which now constitutes the State of California. The Act of 1851 established a mechanism for settling the claims of Mexican citizens to land within the ceded territory.

[2] The Venice Canals were part of an unrelated early subdivision and were designed to provide waterway frontage and access to the lots in the subdivision. The property in question here is not part of that subdivision.

Rancho Ballona was granted to Augustin and Ignacio Machado and Philipe and Tomas Talamantes in 1839 by the then Governor of the Californias, which area was part of Mexico. Following the cession of California to the United States by Mexico, the United States in 1873 patented the title of the Machados and Talamantes to Rancho Ballona pursuant to the Act of 1851.

The Summa Corporation, Venice Peninsula Properties, and other individuals (hereafter the property owners) are the present fee owners of Lots C and R and derive their title from the original Mexican grantees. The Southern California Gas Company[3] owns a recorded easement for two pipelines which traverse the property.

The first attempt to establish a public easement over the property did not occur until 1965, when the City filed the instant action for declaratory relief and to quiet title. By virtue of said easement, the City asserts the right to dredge, construct sea walls, and to make improvements in the Lagoon without the necessity of exercising the power of eminent domain. These proposed improvements would require relocation of the Southern California Gas Company pipelines.

According to the City's complaint, it is entitled to a public trust easement for commerce, navigation and fishery for the reason that the Lagoon is part of the tidelands and is navigable ocean water. As a fallback position, the City also claimed an easement based on express or implied dedication.

The State of California was named as a defendant pursuant to Public Resources Code section 6308 which requires that the state be joined as a necessary party defendant whenever a City brings an action involving tidelands that have been granted to it in trust by the Legislature.

The State filed a cross-complaint for declaratory relief and to quiet title in itself. In reality, however, the interests of the City and the State of California are compatible with each other and are not adverse. We will, for the sake of convenience, therefore, refer to these governmental entities as the State.

The trial court rendered a judgment for the State declaring (1) the existence of the public trust easement for navigation, commerce and fisheries in, over and upon the waters of the Lagoon up to the line of the mean high tide; (2) an easement for passage of fresh sea water through the Lagoon to the

---

[3] Southern California Gas Company is now known as Pacific Enterprises.

Venice Canals; (3) an easement for water recreation; (4) a right in the State and its successors and assigns to open, dredge, construct sea walls, etc., without requirement of the exercise of eminent domain or payment of compensation; (5) a paramount right in the State over the pipeline easement of the Southern California Gas Company; and (6) an easement in the City for public streets and waterways. In summary, however, it can be said that all of the enumerated rights and easements granted to the State by the trial court are simply incidental to and are subsumed by the public trust easement.

Since we conclude that there is no evidence in the record to support any theory of express or implied dedication, the resolution of this appeal turns on whether the State can assert the public trust easement for commerce, navigation and fishery.

In 1852, pursuant to the provisions of the Act of 1851, the Machados and the Talamantes petitioned the Board of Land Commissioners (Board) for confirmation of their title. The Board, after hearing, confirmed title in the petitioners in 1854. The Board's decision was affirmed by the United States District Court, and the decision became final in 1856.

The confirmation and patent process next called for a survey of the boundaries of the Rancho. By the time this survey was conducted, certain landmarks referred to in the original grant had disappeared.

Objections by adjoining Rancho owners to the results of the survey resulted in some 17 years of litigation. The litigation mainly concerned the northwestern borders of the grant which had been marked in the original grant by gullies or barrancas, and the southern boundary, which had as one of its landmarks, a low marshy area or creek (estero) which was described as opening into an inner bay.

During the litigation in the patent proceedings this inner bay was described by the commissioner of the land office as not being an arm of the sea. Several witnesses, who testified concerning the boundaries of Rancho Ballona, described the inner bay as pasture land which was periodically flooded by fresh water overflow.

There is no question that the patent which was ultimately issued embraced within its boundaries the entire Lagoon. The westerly boundary of the Rancho was fixed at the high water mark on the westerly side of the sand bar or ridge which separates the present Lagoon from the ocean.

██ ██ The State concedes that the property owners have valid fee title to Lots C and R, but contends that such title is subject to the public trust easement because they were tidelands or submerged lands prior to the original grant.[4]

Although only Lots C and R are involved in the instant litigation, the State asserts that the entire Lagoon, as it existed at the time of the grant, was and still is subject to the public trust easement. Thus, according to the State, even those areas which are now dry land and developed would be so burdened.

For this reason, the California Land Title Association has appeared on appeal as amicus curiae in support of the property owners. That organization points out that there are a number of areas throughout the State, which are similar to the property in question here, on which title insurance has been issued in reliance on the inviolability of the Mexican land grants.

According to the property owners and amicus, if the State, at this late date, can assert a public trust easement over patented land, the result would be chaotic, especially as to land which has been developed without previous objection by the State.

The property owners concede that the federal regulatory power over navigable waters applies to patented Mexican grant land. The property owners also concede that under the Coastal Act, the State of California can regulate the use of such land by the owners. They contend, however, that the recognition of the existence of the public trust easement directly affects the title to such property and its exercise in the manner in which the State proposes here would render the naked fee title valueless and would amount to inverse condemnation.

The so-called tidelands public trust doctrine is a creature of United States and California law and is an incident of sovereign title in tideland property.

"Upon the acquisition of the territory from Mexico the United States acquired the title to tide lands equally with the title to upland; but with respect to the former they held it only in trust for the future States that might be erected out of such territory." (*Knight* v. *United Land Association* (1891) 142 U.S. 161, 183 [35 L.Ed. 974, 982, 12 S.Ct. 258].)

---

[4] Tidelands are lands between the mean high tide and mean low tide, whereas submerged lands are those seaward of the mean low tide and not uncovered in the ordinary ebb and flow of the tide. (*City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462 [91 Cal.Rptr. 23, 476 P.2d 423].)

Thus California acquired title to navigable waterways and tidelands by virtue of its sovereignty when admitted to the Union in 1850. (*Borax, Ltd.* v. *Los Angeles* (1935) 296 U.S. 10 [80 L.Ed. 9, 56 S.Ct. 23].) This exercise of sovereignty was as a trustee for the public rather than in a proprietary capacity. (*City of Long Beach* v. *Mansell, supra,* 3 Cal.3d 462; *People* v. *California Fish Co.* (1913) 166 Cal. 576 [138 P. 79]; *People* v. *Kerber* (1908) 152 Cal. 731 [93 P. 878]; *Ward* v. *Mulford* (1867) 32 Cal. 365.)

"The control of the State for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining." (*Illinois Central Railroad Co.* v. *Illinois* (1892) 146 U.S. 387, 453 [36 L.Ed. 1018, 1042, 13 S.Ct. 110]; also see *United States* v. *Coronado Beach Co.* (1921) 255 U.S. 472 [65 L.Ed. 736, 41 S.Ct. 378]; *Whitney* v. *United States* (1901) 181 U.S. 104 [45 L.Ed. 771, 21 S.Ct. 565]; *United States* v. *Cambuston* (1858) 61 U.S. (20 How.) 59, 63 [15 L.Ed. 828, 830].)

"As to tide-lands, although it may be stated as a general principle . . . that the titles acquired by the United States to lands in California under tide-waters, from Mexico, were held in trust for the future State, so that their ownership and right of disposition passed to it upon its admission into the Union, that doctrine cannot apply to such lands as had been previously granted to other parties by the former government, or subjected to trusts which would require their disposition in some other way." (*San Francisco* v. *Le Roy* (1891) 138 U.S. 656, 670-671 [34 L.Ed. 1096, 1101, 11 S.Ct. 364].)

■ Our reading of the cases leads us to conclude that the public trust easement only exists over lands to which California acquired title by virtue of its sovereignty upon admission to the Union. California did not acquire such title to lands which were the subject of a prior Mexican land grant and later patented by the United States government in accordance with its obligations under the treaty of Guadalupe Hidalgo.

The nature and effect of the patent issued pursuant to the act of 1851 has been well described by both the United States and California Supreme Courts. The patent of the government is evidence of title and is conclusive against the government and all persons claiming under it. The patent is a deed of the United States and operates as a quit claim of any interest the United States may have reserved in the land. It establishes in the grantee full and *complete* title to the property. (*Beard* v. *Federy* (1866) 70 U.S. (3 Wall.) 478 [18 L.Ed. 88]; *Teschemacher* v. *Thompson* (1861) 18 Cal. 11.)

Further, there appears to be no question but that a federally patented Mexican land grant could embrace tidelands. The State concedes this and it has been so held in *United States* v. *Coronado Beach Co., supra,* 255 U.S. 472, and *San Francisco* v. *Le Roy, supra,* 138 U.S. 656.

In *United States* v. *Coronado Beach Co., supra,* 255 U.S. 472, we find language which in our opinion is controlling of the issue of whether the patented fee title is subject to an unreserved servitude which exists only as an adjunct of sovereignty. That case involved land which had been granted by the Mexican government to one Carrillo and patented by the United States government to Carrillo. The grant covered a portion of North Island in San Diego County and included tidelands bounded seaward to the "anchorage for ships."

The United States, in attacking the validity of the patent as to tideland property, argued that, as here, California became a state prior to the date of the patent and thus its sovereignty over the land existed in spite of the later patent. The Supreme Court there declared that California's title, upon becoming a state, was subject to prior Mexican land grants and that California title was held in abeyance pending determination of the validity and boundaries of the Mexican grant in proceedings established by the Act of 1851.

Further, the United States in that case, challenged the boundaries of the grant insofar as it embraced tidelands. The Supreme Court's answer to that contention was that in the confirmation proceedings there was jurisdiction to decide the issues, right or wrong, and " . . . however arrived at [the decision] was adopted by the United States for its grant and it cannot now be collaterally impeached." (*United States* v. *Coronado Beach Co., supra,* 255 U.S. 472, 488 [65 L.Ed. 736, 742].)

█ It must be emphasized that in the confirmation and patent proceedings under the Act of 1851, the United States was always a party and in a position to assert any interest it claimed to have in the property including any easement claimed by virtue of sovereignty. This is especially significant in the case at bench because the character of the land was, itself, an issue in the confirmation proceedings and was at that point determined not to be tidelands. Thus it was error for the trial court here to permit evidence to be introduced to controvert that determination.

In *United States* v. *Title Ins. Co.* (1924) 265 U.S. 472 [68 L.Ed. 1110, 44 S.Ct. 621], the Supreme Court of the United States dealt with the claims of certain Indians to the right to occupy land which was the subject of a federally patented Mexican land grant. The Indians' right to occupancy was

said to have existed under Mexican law and it was contended that it survived or continued after the patenting process, even though no such reservation was mentioned in the patent.

The Supreme Court, relying on its former decision in *Barker* v. *Harvey* (1901) 181 U.S. 481 [45 L.Ed. 963, 21 S.Ct. 690], rejected the claim and held that any such right of occupancy would have had to have been asserted in the patenting process. The court at page 492 [45 L.Ed. at page 968] stated: "[A] claimant would have little reason for presenting to the land commission his claim to land, and securing a confirmation of that claim, if the only result was to transfer the naked fee to him, burdened by an Indian right of permanent occupancy."

■ The above cited cases are a complete answer to the State's argument here that only the fee title was settled by the patent process and that the public trust easement exists independent of that patent process. It is difficult for us to see how the patent can be described as settling in the grantee a full and *complete* title, while at the same time holding that it was burdened by a servitude of the magnitude of that asserted by the State in this action.

Inasmuch as California never acquired sovereign title to land which was the subject of a prior grant by the Mexican government, the public trust easement, which is an adjunct of sovereignty and a creature of United States and California law, never arose.

The State, by way of a corollary argument, contends that under Mexican law the tidelands could not be subject to private ownership. Thus it argues that there existed under Mexican law a doctrine similar to the California Tidelands Trust Doctrine and that by virtue of that doctrine, the public trust easement passed to the United States upon cession of California by the government by Mexico.

■ We need not here discuss the Mexican law because any contention that Mexican law is controlling of the scope and effect of the United States patenting process has been laid to rest by decisions of the United States and California Supreme Courts.

In the case of *Moore* v. *Smaw* (1861) 17 Cal. 199, the United States sought to claim mineral rights in land which was part of a Mexican land grant patented by the United States under the Act of 1851. The argument there was that under Mexican law, mineral rights did not pass to the grantee but instead remained with the government. The California Supreme

Court rejected that argument by declaring that there was nothing in the Act of 1851 which restricted the operation of the patents to the interest acquired by claimants from the former government. The court held that all the interest of the United States, whatever it may have been, and everything connected with the soil or any portion of it, or everything lying over it or under it, was conveyed to the grantee by the United States in the patent process.

In *Thompson* v. *Los Angeles Farming & Milling Co.* (1901) 180 U.S. 72 [45 L.Ed. 432, 21 S.Ct. 289], an attempt was made to invalidate a federal patent under the Act of 1851 by asserting that Mexican law, at the time of the grant, gave the Governor of California no authority to dispose of certain land in question. The contention was that the Mexican grant was, in effect, void and that the federal patent was likewise void. The Supreme Court in rejecting that argument stated it was the purpose of the Act of 1851 to give final and complete repose to titles. "It was enacted not only to fulfil our treaty obligations to individuals, but to settle and define what portion of the acquired territory was public domain. . . . Upon the confirmation of the claim by the commissioners or by the District or Supreme Court, a patent was to issue and be conclusive against the United States." (*Id.* at pp. 77-78 [45 L.Ed. at p. 435].)

The California Legislature has clearly recognized the highly protected status of the Mexican land grant—a status which inures from a treaty obligation of the United States—in its enactment by which the State's interest in the tidelands was conveyed to the City of Los Angeles, as a successor to the City of Venice.

Chapter 1513 of the Statutes of 1945, granted to the City of Los Angeles as successor to the City of Venice "*all right, title and interest of the State of California* held by said State by virtue of its sovereignty in and to all the tidelands and submerged lands. . . ." That statute, however, contained the following: ". . . excepting any property held under, through or from a Mexican grant or patent. . . ."

Chapter 77 of the Statutes of 1917, which effected the original conveyance of the State's interest to the City of Venice similarly provided that ". . . nothing contained herein shall in any way affect any property held or claimed under, through or from a Mexican grant or patent therefor within the present boundaries and jurisdiction of said city. . . ."

We conclude that the State does not have a public trust easement for commerce, fishing and navigation in the Lagoon, since it never had

sovereign title to the property. That conclusion dictates that the judgment must be reversed since the record here is devoid of any evidence to support a finding of express or implied dedication or any other basis for the various subordinate easements which the trial court attempted to create.

■ The evidence is quite clear that according to an environmental impact report prepared by the City itself, the Venice Canals, as late as 1972 and for a considerable period of time prior thereto, were stagnant and polluted bodies of water with little, if any, fresh sea water flow through the Lagoon. Inasmuch as the State, under our holding here, has no right to dredge or improve the flow through the Lagoon, an easement simply for sea water flow would be worthless.

■ As to the claim that the public has obtained a prescriptive right to use the Lagoon for recreational purposes under the rationale of *Gion* v. *City of Santa Cruz* (1970) 2 Cal.3d 29 [84 Cal.Rptr. 162, 465 P.2d 50], we find that case to be inapplicable.

Contrary to the situation in *Gion,* the Lagoon here is neither a "beach or shoreline" nor a public road, nor as we have indicated, is it a part of navigable ocean waters. Further, there is no evidence of public use which even approximates the extent of the public use in *Gion*.

■ In the absence of an express dedication to public use, it must be presumed that no property owner in fact desires, without compensation, to dedicate his property to public use to the extent that he would lose, for all times, his right to make private use thereof.

Here it is undisputed that the property owners did not in fact intend to dedicate the property to public use. They posted "no trespass" signs as evidence of that lack of intent. In our opinion, they should not now be penalized simply because they did not erect an unsightly and forbidding fence manifesting a continuing hostility to even sporadic and limited public use. To imply an intent to dedicate, under these circumstances, would defy logic, ignore reality and stand equity on its head.

The City contends that its ability to control the property in question is extremely important to the citizens of Los Angeles and the public at large.

It must be remembered that the City has at all times possessed the power of eminent domain by which it could have acquired the right in the property which it seeks.

The constitutional provision which prohibits the taking of private property for public use without just compensation is to ensure that the cost of public facilities be spread among the members of the public and that individual property owners not be required to bear more than their fair share of the burden.

This litigation was commenced in 1965. It seems evident that the cost to the taxpayers, of this protracted litigation aimed at circumventing the Constitution and which has consumed some 23 years far exceeds the cost for which the property could have been acquired had the City in 1965 simply exercised its power of eminent domain.

The judgment is reversed and the matter is remanded to the trial court with directions to enter a new and different judgment declaring that neither the City nor the State has any right to an easement in the affected property. City to bear costs on appeal.

Roth, P. J., and Fukuto, J., concurred.

A petition for a rehearing was denied December 21, 1989, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied March 2, 1989. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.